[No. A113318. First Dist., Div. One. July 20, 2007.]

EVE CHOSAK, Plaintiff and Appellant, v.
ALAMEDA COUNTY MEDICAL CENTER et al., Defendants and
Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified
for publication with the exception of part III.B.

550

552

554

**COUNSEL**

Law Offices of Paul J. Steiner, Paul J. Steiner and Eric C. Shaw for Plaintiff and Appellant.

Donnelly Nelson Depolo & Murray, Erin R. Sabey; Greines, Martin, Stein & Richland, Kent Lewis Richland, Carolyn Oill; Boornazian, Jensen & Garthe, Heather A. Gladstone and Gergory J. Rockwell for Defendants and Respondents.

Opinion

MARGULIES, J.—

## I. INTRODUCTION

In 1975, the Legislature enacted the Medical Injury Compensation Reform Act of 1975 (MICRA), legislation designed to lower medical malpractice insurance premiums by limiting malpractice litigation. Several provisions of MICRA, including Code of Civil Procedure[1] section 340.5, are made applicable to litigation against "health care providers," a phrase the statutes define as including persons who are licensed or certified by the state to practice medicine. In this appeal, we must decide whether the term "health care provider," as so defined, includes a medical student lawfully practicing medicine under a statutory exemption to those licensing requirements. We conclude that it does.

Defendant Lynn Valdez, an optometry student at the University of California, injured plaintiff Eve Chosak's ankle in a mishap during preparation for an eye examination. When the injury failed to improve over the next two weeks, plaintiff was examined in an emergency room by defendant Michelle Dhanak, a licensed physician. Dhanak diagnosed the injury as a sprain without ordering further tests and sent plaintiff away without treatment.

Nearly two years later, plaintiff filed a malpractice action against Valdez and Dhanak, among others. The trial court dismissed the action as barred by the statute of limitations on the authority of section 340.5, which requires a medical malpractice plaintiff to file an action within one year of the date the plaintiff discovered, or should have discovered, his or her injury. Plaintiff appeals the dismissal in favor of these two individual defendants, arguing that Valdez is not covered by section 340.5 because she was an unlicensed medical student and that Dhanak's negligence could not have been discovered until a date within one year of the filing of the action. We affirm.

## II. BACKGROUND

Plaintiff's first amended complaint alleges that on June 5, 2003, she visited defendant Eastmont Wellness Center (Eastmont) for a routine eye examination. She was initially seen by Valdez. Valdez was not a licensed optometrist

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

but a student at the University of California's school of optometry, serving her internship. Valdez sat plaintiff in an examination chair and actuated the chair's controls. As Valdez "started the machine . . . Plaintiff's head began to lower and her feet began to rise. There was a stationary metal arm attached to an eye examination device fixed horizontally above Plaintiff's legs. As the chair rose, Plaintiff's foot became jammed underneath the arm of the eye examination device and her ankle was painfully compressed between the arm of the eye examination machine and the chair." When Valdez was unable immediately to release the chair, "Plaintiff had to throw herself to the ground with enough force to twist her foot free from the machine, leaving her shoe wedged between the two metal pieces." The injury was immediately painful.

Again according to the first amended complaint, when plaintiff's ankle did not heal over the next two weeks, she went to the emergency room at defendant Highland Hospital (hospital) for treatment. There, on June 20, 2003, plaintiff was examined by Dhanak, a physician practicing at the hospital. Dhanak diagnosed plaintiff's injury as a sprain, ignoring plaintiff's request for an X-ray or other diagnostic test. She sent plaintiff away without ordering any further therapy or treatment.

Over two years later, in August 2005, plaintiff arranged for an MRI to be taken of her ankle. The MRI revealed that a bone spur had formed at the site of the injury. According to the complaint, the bone spur "was stated to be a likely cause or contributing factor to Plaintiff's long continuing symptoms."

On March 10, 2005, plaintiff filed a medical malpractice action against the University of California, the hospital, Valdez, Dhanak, and another professional. After an initial round of demurrers, which were granted with leave to amend, plaintiff filed the amended complaint quoted above. Dhanak demurred again on statute of limitations grounds. In her motion papers she included a claim form submitted by plaintiff on December 5, 2003, to the Alameda County Medical Center, which oversees the hospital. In the attachments to the claim form, plaintiff provided more information about her injury. According to the claim form, her injury was examined at Eastmont on the day of the accident. She was not given a clear diagnosis, and no tests were performed. After two weeks with little healing, she visited the hospital's emergency room. There Dhanak told her that "ankle sprains can take weeks to heal" and gave her some literature regarding ankle sprain care. In the claim form, plaintiff stated that "[s]ix months later [after Dhanak's examination], my ankle's condition has worsened. In addition to being sore all the time, swollen, and somewhat difficult to walk on it is now unstable."

Valdez and other defendants associated with the University of California also filed a demurrer on grounds of statute of limitations. The demurrer of

Valdez and other University of California defendants was sustained without leave to amend under the one-year statute of limitations of section 340.5. Dhanak's demurrer was sustained under the same statute with leave to amend "to allege, if possible, facts that show compliance with the applicable statute of limitations, or to show why the statute does not apply."

Plaintiff filed a second amended complaint. According to the allegations of the amended claim against Dhanak, "[Dhanak] diagnosed Plaintiff's June 5, 2003 injury as an ankle sprain and sent her home with general literature on ankle sprains and general instructions on how to care for a sprained ankle and indicating that with a severe sprain the pain could persist for many months and even years. Plaintiff followed the instructions for the care and treatment of her ankle given her by [Dhanak] and reasonably believed that the continuing pain and soreness she had was in the normal course of events for the . . . injury she had sustained." The second amended complaint further alleged that when the pain worsened in February 2004, plaintiff attempted to get an appointment to have the ankle examined at the Alameda County Medical Center but was unable to secure an appointment before April. As an alternative, plaintiff visited a chiropractor in March 2004. At that time, plaintiff alleged, she "for the first time, [began] to understand and discover the cause" of a new injury to her ankle. Her "continued and worsening pain was due to [Dhanak's] failure to properly diagnose and treat [plaintiff's] June 5, 2003 injury, including [Dhanak's] failure to refer Plaintiff for physical therapy or to be examined by an orthopedic specialist for proper diagnosis and immediate treatment." The chiropractor concluded that because plaintiff's injury had continued for nine months without proper treatment, her condition "is permanent. Her prognosis is one of chronic permanent pain and dysfunction on the left ankle."

Dhanak again demurred, submitting the same claim form. Dhanak also submitted a declaration executed by plaintiff on April 21, 2005, in which she characterized Dhanak's advice as "all I had was an ankle sprain and that it might take weeks to heal." This time the demurrer was sustained without leave to amend, the trial court concluding that "Plaintiff's claim against Alameda County Medical Center, dated December 5, 2003, shows that she was aware, at that time, that . . . the condition of her ankle was worsening, and that it had not healed. . . . These admissions [in the claim form], plus Plaintiff's own allegation that she called the Alameda County Medical Center on February 4, 2004 requesting an urgent consultation because the pain in her ankle was becoming more severe, are sufficient to show that Plaintiff had suffered substantial injury and that she suspected her injury was the result of wrongdoing."

## III.  DISCUSSION

On this appeal, plaintiff challenges the dismissal of her claims against Valdez and Dhanak, contending that Valdez cannot claim the protection of the one-year statute of limitations in section 340.5 because she was not a licensed medical professional at the time of the accident and that her claim against Dhanak was not time-barred because it did not accrue until March 2004, when she first learned that Dhanak might have misdiagnosed her injury.[2]

### A.  *Plaintiff's Claim Against Valdez*

■  Plaintiff's claim against Valdez requires us to construe section 340.5, subdivision (1). Statutory interpretation is a question of law subject to de novo review. (*Kim v. Superior Court* (2006) 136 Cal.App.4th 937, 940 [39 Cal.Rptr.3d 338].) Our overriding objective when interpreting a statute "is to determine the drafter's intent." (*Alan v. American Honda Motor Co., Inc.* (2007) 40 Cal.4th 894, 902 [55 Cal.Rptr.3d 534, 152 P.3d 1109].) In making that determination, we look first to the words of the statute because they " ' "generally provide the most reliable indicator of legislative intent." ' " (*Bernard v. Foley* (2006) 39 Cal.4th 794, 804 [47 Cal.Rptr.3d 248, 139 P.3d 1196].) "The rules for performing this task are well established. We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.] That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole." (*People v. Cole* (2006) 38 Cal.4th 964, 975 [44 Cal.Rptr.3d 261, 135 P.3d 669].)

If this analysis demonstrates that the statute's language is clear and unambiguous, "it governs. [Citation.] Experience teaches, however, that unforeseen ambiguities can and do come to light despite the drafters' considered efforts to avoid them." (*Alan v. American Honda Motor Co. Inc., supra,* 40 Cal.4th at p. 902.) "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) "[I]t is appropriate to consider 'the consequences that will flow from a particular interpretation. [Citation.]' [Citation.]

---

[2] Plaintiff concedes that her claims against Glen Ozawa, O.D., Valdez's supervisor, and against the University of California are time-barred under section 340.5.

Where more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that leads to the more reasonable result. [Citation.]' [Citation.] . . . Thus, our task is to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results." (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291 [48 Cal.Rptr.3d 183, 141 P.3d 288].) Ultimately, "[t]he legislative purpose will not be sacrificed to a literal construction of any part of the statute." (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 220 [123 Cal.Rptr.2d 735].)

## 1.  *Plain Meaning*

### a.  *Section 340.5*

■ The trial court sustained Valdez's demurrer on the basis of section 340.5, which sets the statute of limitations governing medical malpractice actions. Under section 340.5, a claim must be filed within the lesser of three years or one year from the date "the plaintiff discovers, or through the use of reasonable diligence should have discovered," his or her injury. Under its terms, section 340.5 applies to actions "for injury or death against a health care provider based upon such person's alleged professional negligence." "Health care provider" is defined in subdivision (1) of section 340.5 as "any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider."

There is no dispute that Valdez, a student, did not possess a license issued pursuant to division 2 of the Business and Professions Code (Division 2). She was not practicing unlawfully, however, because an express exemption from the licensing requirements authorizes optometry students to practice as part of their education. (Bus. & Prof. Code, § 3042.5, subd. (a).) Relying on the plain language of subdivision (1), plaintiff argues that Valdez may not claim the protection of section 340.5 because she was not a "person licensed or certified."[3] Valdez responds that we should construe the phrase "any person licensed or certified pursuant to Division 2 (commencing with Section 500)

---

[3] If section 340.5 were found inapplicable, plaintiff's claim against Valdez would be timely under the applicable two-year statute of limitations in section 335.1.

of the Business and Professions Code" broadly to cover any person authorized to practice medicine under those licensing and certification statutes, regardless of whether the person actually possesses a license or certificate.

### b. *Medical Licensing Requirements*

■ Division 2 is entitled, "Healing Arts." Running from sections 500 through 4999.7, it regulates not only physicians, but also dentists, chiropractors, audiologists, dietitians, physical therapists, nurses, psychologists, optometrists, pharmacists, veterinarians, and a variety of other health-related professions. The division imposes licensing, certification, or registration requirements for the various professions, with the strictness of these requirements varying among the disciplines. For example, persons must hold a valid, unexpired license in order to practice dentistry and nursing, while physicians and surgeons must have a valid, unrevoked, and unsuspended certificate to practice medicine. (Bus. & Prof. Code, §§ 1626, 2052, 2732.) In contrast, dietitians are neither licensed nor certified, and it is not unlawful to practice dietetics without the registration provided by statute. Registration is, however, required before dietitians can perform certain activities.[4] (Bus. & Prof. Code, §§ 2585, 2586.)

■ The licensing and certification requirements of Division 2 are not, however, absolute. The various chapters of Division 2 contain exemptions from the licensing and certification requirements covering limited sets of persons and circumstances. For example, medical students may practice without a certificate, as may medical school graduates while in their first year of postgraduate training. (Bus. & Prof. Code, §§ 2064, 2065.) Physicians licensed in other states may "consult" in California without a California certificate and may practice without certification for the first two years after commencing work at a state-run institution. (Bus. & Prof. Code, §§ 2060, 2072.) Dental students may practice dentistry in California without a license, as may dentists licensed in other states while teaching at a California dental school. (Bus. & Prof. Code, § 1626, subds. (b), (c).) As Valdez notes, optometry students may practice without a license as part of the activities of their school. (Bus. & Prof. Code, § 3042.5, subd. (a).) The code also contains an exemption permitting optometrists licensed in other states to practice in California while teaching at a California optometry school, but this exemption is not automatic and must be obtained from the licensing board. (Bus. & Prof. Code, § 3042.5, subd. (b).) In short, while most persons must obtain a license or certificate to practice the healing arts lawfully in California, there are exceptions to this general rule, each exception tailored to the needs of the particular profession.

---

[4] We have no occasion in this decision to decide whether section 340.5 applies to medical professionals regulated by Division 2 but not subject to a license or certification requirement.

c. *The Legal Context*

■ Subdivision (1) of section 340.5 came into existence as part of a multifaceted legislative act directed at medical malpractice, MICRA. (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, pp. 3949–3978.) MICRA was a response to concerns that the cost of medical malpractice insurance was threatening the availability of reasonably priced health care in California, and its various provisions were intended to reduce the premiums for such insurance by placing limits on the availability and extent of recovery in medical malpractice litigation. (*Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 577 [53 Cal.Rptr.3d 887, 150 P.3d 764].) "The continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation. [Citation.] Accordingly, MICRA includes a variety of provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence. (See Bus. & Prof. Code, § 6146 [limiting contingency fees in medical malpractice actions]; Civ. Code, § 3333.1 [admitting evidence of collateral source payments and precluding subrogation on behalf of collateral sources]; Code Civ. Proc., § 667.7 [authorizing periodic payments for future damages in excess of $50,000, with termination of benefits in the event of death] . . . .)" (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111–112 [32 Cal.Rptr.2d 263, 876 P.2d 1062].)

The same definition of "health care provider" found in section 340.5 is also found in a number of other statutes enacted as part of MICRA. (See Bus. & Prof. Code, § 6146, subd. (c)(2); Civ. Code, §§ 3333.1, subd. (c)(1), 3333.2, subd. (c)(1); Code Civ. Proc., §§ 364, subd. (f)(1), 667.7, subd. (e)(3), 1295, subd. (g)(1).) The definition has since been used in several other statutes, all pertaining to medical malpractice. (E.g., Civ. Code, §§ 43.9, subd. (d)(1), 1714.8, subd. (b); Code Civ. Proc., § 425.13, subd. (b).)

d. *Plain Meaning*

Construing the words of section 340.5 "in context, keeping in mind the statutes' nature and obvious purposes" (*People v. Cole, supra*, 38 Cal.4th at p. 975), we conclude that this is one of those situations in which "the statutory language permits more than one reasonable interpretation . . . ." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra*, 34 Cal.4th at p. 737.) Certainly the meaning proposed by plaintiff, restricting "health care provider" to persons who actually hold a license or certificate from the state, is reasonable. It is, in fact, the most obvious meaning of the words used by the Legislature, which restrict "health care provider" to "persons licensed or certified" under state statute.

Yet we conclude that the meaning proposed by Valdez—that subdivision (1) of section 340.5 includes persons who are lawfully practicing pursuant to an exception to a licensing or certification requirement—is also reasonable. As well as referring to an actual licensing process, the words "person licensed or certified" can carry a more general implication of "person legally authorized." While Webster's dictionary lists "to issue a license to" as the initial definition for the verb "license," it also includes two other more general definitions: "to permit or authorize especially by formal license" and "to give permission or consent to." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 717.) Exempting a person from licensing requirements gives him or her "permission or consent" to practice on a par with an actual license.

While the dictionary meaning of "certified" is not so broad, it, too, can be construed to cover those exempted from a licensing or certification requirement. The most relevant definition of "certify" is "to recognize as having met special qualifications (as of a governmental agency or professional board) within a field." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 203.) The most direct way to recognize persons as having met special qualifications is, of course, to issue them a certificate, but an express exemption from the same certification requirements similarly recognizes the exempted persons as "having met special qualifications . . . within a field."

■ Accordingly, the plain meaning of the words of subdivision (1) of section 340.5 could refer not only to the granting of a license or certificate but also more generally to the granting of legal authorization to practice medicine. Either definition is equally consonant with the nature and purpose of the statutes. The MICRA statutes that include this definition, among them section 340.5, are intended to apply generally to medical malpractice actions. The negligence of all persons legally authorized to practice medicine is equally medical malpractice, whether those persons practice under a license or certificate or under an exemption from the licensing and certification requirements.

### 2. *Construing Section 340.5*

Having concluded that the statutory language can bear either meaning, we proceed to a more detailed consideration of "the statute's purpose, legislative history, and public policy" to determine which of the proposed definitions best fits the intent of the Legislature in enacting the statute. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles, supra,* 34 Cal.4th at p. 737.) In doing so, we keep in mind that "[w]here more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that leads to the more reasonable result. [Citation.]' [Citation.] . . . [O]ur task is to select the construction that comports most closely

with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purpose, and to avoid a construction that would lead to unreasonable, impractical, or arbitrary results. [Citations.]" (*Copley Press, Inc. v. Superior Court, supra*, 39 Cal.4th at p. 1291.)

### a. *History of Section 340.5*

Although subdivision (1) was added to section 340.5 by MICRA, the history of the statute itself begins a few years earlier. Until 1936, the statute of limitations applicable to a claim for medical malpractice commenced on the date of the injury and ran for one year, pursuant to former section 430, subdivision (3). (E.g., *Krebenios v. Lindauer* (1917) 175 Cal. 431, 432 [166 P. 17]; see Caprioglio, *A Four Year Statute Of Limitations For Medical Malpractice Cases: Will Plaintiff's Case Be Barred?* (1971) 2 Pacific L.J. 663, 664–665 (hereafter *Four Year Statute.*) In that year, the Supreme Court rejected the strict one-year rule, holding that the statute of limitations in medical malpractice cases would not run against a person who was ignorant of his or her cause of action and could not reasonably have ascertained the existence of that claim. (*Huysman v. Kirsch* (1936) 6 Cal.2d 302, 312–313 [57 P.2d 908].) This principle evolved into the well-known discovery rule.

Section 340.5 was enacted in 1970, during an earlier period of concern with medical malpractice insurance premiums, to cure what was viewed as a defect of the discovery rule: that the accrual of claims for medical malpractice "might be deferred indefinitely" until the plaintiff had reason to become aware of his or her claim. (*Sanchez v. South Hoover Hospital* (1976) 18 Cal.3d 93, 97 [132 Cal.Rptr. 657, 553 P.2d 1129]; see *Four Year Statute, supra*, at pp. 667–668.) Advocates claimed that because of the sense that a physician was "never free from the threat of a malpractice suit, regardless of the number of years that have elapsed since the patient was treated," insurance companies were required to maintain expensive reserves to protect against old claims, thereby inflating malpractice insurance premiums. (See *Four Year Statute*, at p. 668.)

While section 340.5, as newly enacted in 1970, retained the discovery rule, it put an absolute four-year cap on the statute of limitations for medical malpractice actions, regardless of the date of discovery. (Stats. 1970, ch. 360, § 1, pp. 771–772.) Because the legislative history of the original section 340.5 suggested a "modest purpose—that its drafters sought to retain the substance of the common law discovery rule, while modifying its 'open-ended' operation" (*Sanchez v. South Hoover Hospital, supra*, 18 Cal.3d at p. 98), the statute was interpreted to incorporate the existing common law governing medical malpractice statutes of limitation, merely superimposing the four-year maximum. (*Id.* at p. 99.) As such, the statute represented a balance

between the interests of medical practitioners and persons with potentially worthy claims. (*Larcher v. Wanless* (1976) 18 Cal.3d 646, 655 [135 Cal.Rptr. 75, 557 P.2d 507].)

Of particular interest to the present question is the scope of coverage provided by original section 340.5. Rather than the current language covering licensed or certified health care professionals, section 340.5 originally covered "an action for injury or death against a physician or surgeon, dentist, registered nurse, dispensing optician, optometrist, registered physical therapist, podiatrist, licensed psychologist, osteopath, chiropractor, clinical laboratory bioanalyst, clinical laboratory technologist, veterinarian, or a licensed hospital as the employer of any such person, based upon such person's alleged professional negligence . . . ." (Stats. 1970, ch. 360, § 1, pp. 771–772.)

The enactment of section 340.5 in 1970 was deemed insufficient to address the growing cost of medical malpractice insurance premiums, for in 1975 the Legislature enacted MICRA, a much more extensive statute aimed at the same problem. MICRA's impact on section 340.5, however, was small. The amendments enacted as part of MICRA reduced section 340.5's four-year cap to three years, required actions by minors to be commenced within three years of injury, and introduced the concept of "health care provider," defined in new subdivision (1). (See Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 25, p. 3969.) That definition replaced the list of professionals found in the 1970 version.

b. *Legislative History of Section 340.5, Subdivision (1)*

The legislative history of MICRA contains very little of use in interpreting subdivision (1) of section 340.5. The legislation was introduced as Assembly Bill No. 1 (1975–1976 2d Ex. Sess.) on May 19, 1975, during an extraordinary session called by then Governor Brown to address the problem of rising medical malpractice premiums. The bill as initially introduced did contain the definition that eventually became subdivision (1), but it did not apply that definition to section 340.5, which retained the list of covered health care professionals found in the 1970 version of the statute. In Assembly Bill No. 1, as passed by the Assembly, section 340.5 still retained the list of covered professionals from the 1970 statute, but the maximum period for filing an action was reduced from four years to three, as in the present statute. It was not until the final amendment in the Senate that the bill assumed its current form, with the list of professionals from 1970 deleted in favor of the definition of "health care provider" now found in subdivision (1).

In the various legislative analyses generated in connection with Assembly Bill No. 1 (1975–1976 2d Ex. Sess.), there is no mention of this change. As

relevant here, the legislative analysis of the final bill notes only that "[Assembly Bill No. 1] changes the present statute of limitations in order to provide that any legal action for medical malpractice must be commenced within three years from the date of the alleged wrongful act or one year from discovery, whichever is first." In a document prepared by the Assembly Office of Research regarding the amendments introduced in the Senate, entitled "Concurrence in Senate Amendments," the amendment to add a new definition of "health care provider" to section 340.5 does not even rate a mention. Nothing in the legislative history suggests that the Legislature intentionally distinguished between persons who actually held a license or certificate and persons lawfully practicing under an exemption to the licensing and certification requirements.

Perhaps the most likely purpose of the amendment was this suggestion from a decision addressing the same amendment made with respect to a different MICRA provision: "Ultimately, the Legislature abandoned the list [of professionals] concept and adopted the definition of 'health care provider' by reference to the code divisions covering the licensing of the various providers. . . . [T]he reference to the divisions of the codes not only simplified the statutory reference but also provided for the evolution of health care professions and organizations. New categories of providers could be automatically covered by MICRA simply by regulating them within the same statutory scheme as other health care providers." (*Coe v. Superior Court* (1990) 220 Cal.App.3d 48, 52 [269 Cal.Rptr. 368].) Based on this slim evidence, subdivision (1) appears to have been intended to add flexibility to section 340.5, without changing its essential scope. If anything, subdivision (1) was intended to make section 340.5 even more comprehensive in its application to medical malpractice claims.

### c. *Purpose and Public Policy*

We have already discussed the purpose of the changes introduced to California tort law by MICRA: to lower medical malpractice insurance premiums by reducing medical malpractice recoveries and making them more predictable. "MICRA thus reflects a strong public policy to contain the costs of malpractice insurance by controlling or redistributing liability for damages, thereby maximizing the availability of medical services to meet the state's health care needs." (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital, supra*, 8 Cal.4th at p. 112.)

### d. *Interpretation of Section 340.5, Subdivision (1)*

Taking into account the language, history, and public policy surrounding section 340.5, we conclude that the intent of the Legislature is best served by

adopting Valdez's more comprehensive construction of subdivision (1). We reach this conclusion for several reasons.

■ First, and perhaps most important, every indication from the language and history of the statute is that the Legislature intended section 340.5 to apply to all medical malpractice lawsuits filed in California. Every discussion of the statute assumes that its reach is comprehensive. Conversely, there is no indication that subdivision (1) was meant to exclude any particular categories of medical malpractice action from coverage—other than, perhaps, negligence by persons who were not legally authorized to practice medicine in the first place. On the contrary, by causing section 340.5 to apply to the conduct of all licensed or certified medical practitioners, the Legislature indicated its intent to reach as broadly as possible. An action based on the negligence of a medical student or an out-of-state doctor legally practicing in California under the licensing and certification exemptions of Division 2 is just as much a medical malpractice action as an action against a licensed or certified doctor. If the statute was intended, as it unquestionably was, to cover all medical malpractice claims, it should be construed to cover all actions against medical professionals operating lawfully under the licensing and certification statutes, whether licensed or exempt.

Second, the public policy promoted by MICRA will be advanced by adopting the broader definition. To the extent section 340.5 and the other provisions of MICRA containing the same definition of "health care providers" successfully reduce medical malpractice insurance premiums, an interpretation that excludes unlicensed but lawfully practicing persons from their coverage will drive up the cost of insuring such persons, contrary to the intent of the Legislature. Although the parties have provided us with no evidence of the extent of lawful practice by exempt medical professionals in California, it is common knowledge that health care students, such as Valdez, must practice in order to learn and that recent medical school graduates—interns—play a significant role in providing care in some hospitals in California. Excluding such persons from the coverage of section 340.5 and its sister provisions will presumably inflate medical malpractice insurance premiums for institutions instructing or employing them.

■ Third, there is no apparent reason to exclude lawfully practicing, but unlicensed or uncertified, persons from the coverage of section 340.5. They provide the same type of services as licensed doctors. Experienced, but exempt, professionals are presumably exempted from licensing for legitimate policy reasons having no relationship to the quality of medical care they provide. While medical students may be less adept than licensed doctors, they

operate under the supervision of licensed professionals. There is simply no distinction between licensed and exempt professionals that argues for a longer statute of limitations with respect to the latter.

While we are unaware of any case that has considered this precise issue previously, we find support for our conclusion in a decision of the Colorado Supreme Court that addresses a similar statute. In *Scholz v. Metropolitan Pathologists, P.C.* (Colo. 1993) 851 P.2d 901, the plaintiff suffered an unnecessary surgery as a result of a laboratory technician's error in labeling tissue sample slides. (*Id.* at p. 903.) Like California, Colorado has a statute limiting noneconomic damages in medical malpractice actions. The Colorado statute covers actions against "health care professionals," defined as persons licensed to practice medicine. (*Id.* at p. 904.) The plaintiff argued that his claims against the technician were not covered by the statute because the technician was not a licensed professional. In rejecting the argument, notwithstanding the language of the statute, the court noted, "In seeking to curb the increasing costs of malpractice insurance in this state, there is nothing in the [statute limiting noneconomic damages] which suggests the legislature sought to do so only by limiting recoveries for actions brought against licensed professionals or professional corporations and entities whose liability results solely from the conduct of those professionals. The reason that no such suggestion exists is clear: the negligent conduct of unlicensed employees, such as [the laboratory technician], who contribute to providing health care services affects the insurance premiums that health care providers pay, just as the conduct of professionals within those entities does." (*Id.* at p. 905.)

■ In the same way, the activities of medical students and other exempt professionals in California affect "the insurance premiums that health care providers pay," just as the activities of licensed health care providers do. In the absence of some reason grounded in policy to exclude such persons from the coverage of MICRA, we are unwilling to interpret the statute in a manner that would work at cross-purposes to the Legislature's objective in enacting section 340.5 and the other provisions of MICRA. Because Valdez was practicing lawfully under an express exemption from the licensing and certification requirements of Division 2, we conclude that she was within the definition of "health care provider" of section 340.5, subdivision (1).

B. *Plaintiff's Claim Against Dhanak**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 549.

## IV.  DISPOSITION

The judgment is affirmed.

Stein, Acting P. J., and Swager, J., concurred.

On July 27, 2007, the opinion was modified to read as printed above.