Filed 5/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MT. HAWLEY INSURANCE COMPANY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICHARD R. LOPEZ, JR.,<br><br>    Defendant and Appellant. | B234082<br><br>(Los Angeles County<br>Super. Ct. No. BC434879)<br><br><br>**ORDER MODIFYING OPINION**<br>**[NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed on May 1, 2013, and certified for publication, be modified as follows:

1. On page 3, the last sentence of the first full paragraph reads:

"The eight-count indictment included alleged violations of title 18 United States Code sections 18 (conspiracy), 1001 (making false statements), and 1519 (destruction, alteration, or falsification of evidence in federal investigations)."

It should read: "The eight-count indictment included alleged violations of title 18 United States Code sections **371** (conspiracy), 1001 (making false

statements), and 1519 (destruction, alteration, or falsification of evidence in federal investigations)."

The foregoing does not change the judgment.

_____

WOODS, Acting P. J.          ZELON, J.          SEGAL, J.*

*       Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 5/1/13 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MT. HAWLEY INSURANCE COMPANY,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>RICHARD R. LOPEZ, JR.,<br><br>      Defendant and Appellant. | B234082<br><br>(Los Angeles County<br>Super. Ct. No. BC434879) |

      APPEAL from a judgment of the Superior Court of Los Angeles County, Robert L. Hess, Judge.  Reversed.

      Manatt, Phelps & Phillips, Amy B. Briggs, Kenneth B. Julian, Benjamin G. Shatz, and Amanda M. Knudsen, for Defendant and Appellant.

      Morison Holden & Prough, William C. Morison and Michael D. Prough, for Plaintiff and Respondent.

_____

## INTRODUCTION

Insurance Code section 533.5, subdivision (b),[1] precludes insurers from providing a defense for certain kinds of claims. The statute provides: "No policy of insurance shall provide, or be construed to provide, any duty to defend . . . any claim in any criminal action or proceeding or in any action or proceeding brought pursuant to" California's unfair competition law under Business and Professions Code sections 17200 and 17500 "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel, notwithstanding whether the exclusion or exception regarding the duty to defend this type of claim is expressly stated in the policy." In *Bodell v. Walbrook Ins. Co.* (9th Cir. 1997) 119 F.3d 1411 (*Bodell*), the Ninth Circuit held that section 533.5, subdivision (b), applies to criminal actions brought by the four listed state and local agencies but does not apply to criminal actions brought by federal prosecutors. The dissenting judge in *Bodell* and the trial court in this case concluded that section 533.5, subdivision (b), applies to any criminal action, including federal criminal actions. We agree with the Ninth Circuit and hold that section 533.5, subdivision (b), does not preclude an insurer from agreeing to provide a defense for criminal actions against its insured brought by federal prosecutors. Therefore, the insurer in this case, which had agreed to provide its insureds with a defense in "a criminal proceeding . . . commenced by the return of an indictment" "even if the allegations are groundless, false or fraudulent," cannot avoid its contractual duty to defend an insured against federal criminal charges by relying on section 533.5, subdivision (b).

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Indictment*

On January 6, 2010 the United States Attorney for the Central District of California filed a grand jury indictment charging Dr. Richard Lopez with criminal conspiracy, false statements and concealment, and falsification of records. The indictment alleged that Lopez, who was the medical director of the St. Vincent's Medical

---

[1]    Statutory references are to the Insurance Code unless otherwise indicated.

2

Center Comprehensive Liver Disease Center, conspired with another doctor and other hospital employees in the liver transplant program to transplant a liver into the wrong patient.[2]

According to the indictment, Lopez diverted a liver designated for one patient to a different patient who was further down the list of patients waiting for a liver transplant, in violation of regulations promulgated by the United States Department of Health and Human Services under the National Organ Transplant Act, and then covered up his diversion. The indictment alleges that Lopez initially notified the United Network for Organ Sharing (UNOS) that the second patient had received the liver, but later falsely told UNOS that the first patient had received the liver. The indictment further alleges that as a result the first patient never received a liver, "was removed from the liver transplant wait list," was "thereafter deprived of the opportunity to have this life-saving operation," and subsequently died. The indictment alleges that Lopez engaged in a cover-up by directing his co-conspirators to restore the second patient's name to the transplant waiting list (even though the second patient had received the liver designated for the first patient), create a false pathology report for the first patient based on data in the second patient's pathology report, and alter medical reports to support a claim "that the transplant program had made an honest mistake confusing the names." The eight-count indictment included alleged violations of title 18 United States Code sections 18 (conspiracy), 1001 (making false statements), and 1519 (destruction, alteration, or falsification of evidence in federal investigations).

2. *The Policy*

Daughters of Charity Health Systems, Inc. (DCHS), which owns St. Vincent's, purchased a "Not For Profit Organization and Executive Liability Policy" pursuant to which Mt. Hawley agreed to "pay on behalf of the Insureds, Loss which the Insureds are

---

[2] Lopez, using a relatively expansive concept of "success," contends that "[a]lthough the surgery was successful, the organ was transplanted into the wrong patient."

legally obligated to pay as a result of Claims . . . against the Insured for Wrongful Acts . . . ." The policy defines "Loss" as "monetary damages, judgments, settlements, including but not limited to punitive, exemplary, multiple or non-contractual liquidated damages where insurable under applicable law, . . . and Defense Expenses which the Insureds are legally obligated to pay as a result of a covered Claim." The policy further provides that Mt. Hawley "shall have the right and duty to defend any Claim covered by this Policy, even if any of the allegations are groundless, false or fraudulent . . . ." An endorsement defines "claim" to include "a criminal proceeding against any Insured commenced by the return of an indictment" or "a formal civil, criminal, administrative or regulatory investigation against any Insured . . . ." The policy's definition of "insured" can include employees of St. Vincent's like Lopez.[3]

### 3. *The Action*

On March 3, 2010 Lopez tendered the defense to the charges to Mt. Hawley. On April 1, 2010 Mt. Hawley, through its attorneys, sent a letter to Lopez declining to defend or indemnify Lopez, and on the same date filed this action. Mt. Hawley's first amended complaint alleged that a doctor at St. Vincent's, with Lopez's "knowledge and approval," transplanted a liver designated for one patient "who was second in line on the regional waitlist" for a liver into another patient "who was fifty-second on the waiting list," without prior approval. Mt. Hawley alleged that Lopez "engaged in an elaborate cover-up of the 'switch,' which included falsification of documents and encouragement of others to participate in the cover-up." Mt. Hawley alleged that it had no duty to defend

---

[3] Mt. Hawley does not really contend that Lopez is not an insured under the policy. The closest Mt. Hawley comes to making such an argument is a statement in a footnote that "Dr. Lopez was a stranger to the contract and at best an incidental third-party beneficiary to the extent he qualifies as an 'insured' for limited purposes," and therefore "Mt. Hawley made no representations to him, promising to defend him if he was charged with a crime or otherwise." We do not read this cryptic sentence as an argument by Mt. Hawley that Lopez is not an insured under the policy. (See *Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["[f]ootnotes are not the appropriate vehicle for stating contentions on appeal"].)

4

Lopez because of section 533.5, a "remuneration exclusion" or "personal profit exclusion," and a "medical incident exclusion."[4]  Mt. Hawley sought a declaration that it did not owe Lopez a duty to defend or indemnify in connection with the indictment. Lopez filed a cross-complaint against Mt. Hawley for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.

      4. *The Demurrer and the Motion for Summary Judgment*

      Lopez filed a motion for judgment on the pleadings on Mt. Hawley's original complaint and a demurrer to Mt. Hawley's first amended complaint.  Lopez argued in both motions that section 533.5 did not preclude an insurer from providing a defense to federal criminal charges brought by U.S. Attorney's Office, that the remuneration/personal profit exclusion did not apply because there was no judgment or final adjudication against Lopez, and that the medical incident exclusion did not apply because it was not part of the policy.  The trial court rejected Lopez's argument that section 533.5 did not apply, granted the motion for judgment on the pleadings on the original complaint with leave to amend to allow Mt. Hawley to attach a copy of the policy to the complaint, and then overruled Lopez's demurrer to the first amended complaint.

      Mt. Hawley subsequently filed a motion for summary judgment or in the alternative for summary adjudication.  Mt. Hawley argued that it had no duty to defend Lopez against the grand jury indictment "because any defense obligation is excluded by

---

[4]     The remuneration exclusion, subdivision (c) of Exclusion 3, excluded coverage where the insured gains "any profit, remuneration or advantage to which such Insured is not legally entitled if a judgment or final adjudication adverse to such Insured establishes that such Insured gained such profit, remuneration or advantage."  The medical incident exclusion, subdivision (g) of Exclusion 3, excluded coverage for rendering or failing to render certain professional services.  Mt. Hawley conceded that because of "a clerical error" the medical incident exclusion was not included in the policy, but alleged that "upon realizing the clerical error" Mt. Hawley "immediately notified [Daughters of Charity]" of the mistake and "corrected the clerical error by issuing endorsements which, on their face, are effective as [of] the inception of the insurance contracts of which they were made a part."

California Insurance Code section 533.5 (b)." Mt. Hawley also argued that it was entitled to summary judgment on its declaratory relief causes of action and on Lopez's cross-complaint because under section 533.5 Mt. Hawley had no duty to defend or indemnify Lopez. Although both Mt. Hawley and Lopez argued that section 533.5, subdivision (b), was unambiguous and supported their respective proposed interpretations, both sides submitted portions of the legislative history of the statute in support of their positions.

     5. *The Ruling*

The trial court found that "section 533.5 unambiguously bars coverage for criminal actions and proceedings" and that "the plain language of section 533.5 bars Mt. Hawley's duty to defend or indemnify Dr. Lopez against the Indictment." The trial court acknowledged that "the legislative history seems to indicate that section 533.5 was enacted in response to difficulties that the Attorney General had encountered in settling actions under the unfair competition law due to the participation of insurance companies," but "perceive[d] nothing in the legislative history from which it could clearly conclude that section 533.5 was intended to apply to state and local criminal actions only as opposed to all criminal actions, including federal proceedings." The trial court concluded that "the correct interpretation of [section] 533.5 is that the enumeration of state, county and local prosecutors ought to be read as referring only to civil actions for unfair competition and false advertising. And that the prohibition against furnishing a defense in a criminal action applies regardless of the entity that commenced the criminal prosecution." The trial court stated that the Ninth Circuit's decision in *Bodell* was not binding and was unpersuasive, and concluded that the *Bodell* court's "analysis of [section] 533.5, is in error." The trial court therefore granted Mt. Hawley's motion for summary judgment on Mt. Hawley's first amended complaint and on Lopez's cross-complaint.

The trial court entered judgment in favor of Mt. Hawley and against Lopez on June 23, 2011. Lopez filed a timely notice of appeal on June 29, 2011.

6

# DISCUSSION

### 1. *Standard of Review*

We review a grant of summary judgment de novo. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142; see *Culver Center Partners East # 1, L.P. v. Baja Fresh Westlake Village, Inc.* (2010) 185 Cal.App.4th 744, 749.) "On appeal from the granting of a motion for summary judgment, we examine the record de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) The de novo standard of review applies to issues of statutory and insurance policy interpretation. (See *Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724 (*Bruns*) ["[s]tatutory interpretation is a question of law that we review de novo"]; *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 414 ["[w]e apply a de novo standard of review to an order granting summary judgment when, on undisputed facts, the order is based on the interpretation or application of the terms of an insurance policy"]; *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082 [where the pertinent facts are undisputed and the issue is one of statutory interpretation, "the question is one of law and we engage in a de novo review of the trial court's determination"].)

A "decision to sustain or overrule a demurrer is subject to de novo review on appeal . . . ." (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.) "In reviewing an order overruling a demurrer, we accept as true all properly pleaded facts in the complaint and exercise independent judgment to determine whether the complaint states a cause of action as a matter of law." (*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 373; see *Boy Scouts of America National Foundation v. Superior Court* (2012) 206 Cal.App.4th 428, 438 ["[t]he reviewing court accepts as true all facts properly pleaded in the complaint in order to determine whether the demurrer should be overruled"].)

7

2. *The Trial Court Erred in Granting Mt. Hawley's Motion for Summary Judgment*

   a. *Section 533.5*

Section 533.5, subdivision (b), as originally enacted in 1988, provided: "No policy of insurance shall provide, or be construed to provide, any duty to defend, as defined in subdivision (c), any claim in any civil or criminal action or proceeding in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, or any city prosecutor, notwithstanding whether the exclusion or exception regarding the duty to defend this type of claim is expressly stated in the policy."[5]

In 1990 the Legislature amended section 533.5, subdivision (b), to read substantially as it does now: "No policy of insurance shall provide, or be construed to provide, any duty to defend, as defined in subdivision (c), any claim in any criminal action or proceeding or in any action or proceeding brought pursuant to Chapter 5 (commencing with Section 17200) of Part 2 of, or Chapter 1 (commencing with Section 17500) of Part 3 of, Division 7 of the Business and Professions Code in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, or any city prosecutor, notwithstanding whether the exclusion or exception regarding the duty to defend this type of claim is expressly stated in the policy." The parties agree that the language "Chapter 5 (commencing with Section 17200) of Part 2 of, or Chapter 1 (commencing with Section 17500) of Part 3 of, Division 7 of the Business

---

[5] Section 533.5, subdivision (c), provides: "For the purpose of this section, 'duty to defend' means the insurer's right or obligation to investigate, contest, defend, control the defense of, compromise, settle, negotiate the compromise or settlement of, or indemnify for the cost of any aspect of defending any claim in any criminal action or proceeding or in any action or proceeding brought pursuant to Chapter 5 (commencing with Section 17200) of Part 2 of, or Chapter 1 (commencing with Section 17500) of Part 3 of, Division 7 of the Business and Professions Code in which the insured expects or contends that (1) the insurer is liable or is potentially liable to make any payment on behalf of the insured or (2) the insurer will provide a defense for a claim even though the insurer is precluded by law from indemnifying that claim."

8

and Professions Code" refers to California's unfair competition and false advertising laws, commonly referred to as the UCL and the FAL. (See *Hill v. Roll Internat. Corp.* (2011) 195 Cal.App.4th 1295, 1298.)

In 1991 the Legislature amended section 533.5, subdivision (b), a second time to add county counsel to the list of prosecutors in the statute. Thus, the statute currently reads: "No policy of insurance shall provide, or be construed to provide, any duty to defend, as defined in subdivision (c), any claim in any criminal action or proceeding or in any action or proceeding brought pursuant to" the UCL or the FAL "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel, notwithstanding whether the exclusion or exception regarding the duty to defend this type of claim is expressly stated in the policy."

No California court has addressed the issue raised by this appeal of whether section 533.5, subdivision (b), precludes an insurer from providing a defense in all criminal actions, including federal criminal actions.[6] In *Bodell*, *supra*, 119 F.3d 1411, the Ninth Circuit held that "the phrase 'sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel' modifies both 'any criminal action or proceeding' and 'any action or proceeding brought pursuant to [the UCL and FAL],' and that the statute therefore only precludes the tender of a defense in all criminal actions and certain civil actions brought by state, county or city officials." (*Id.* at p. 1416.) The dissent in *Bodell* argued that the phrase "sought by the Attorney General, any district

---

[6]     In *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, the Supreme Court stated that as originally enacted in 1988, section 533.5 "barred coverage in all civil and criminal actions, whatever the theory of liability, brought by the Attorney General, a district attorney, or a city prosecutor. [Citation.] In 1990, the Legislature limited the statute's reach to criminal actions and actions under the Unfair Business Practices Act." (*Id.* at p. 1271.) This passage suggests that the "limited reach" of the statute as a result of the 1990 amendment also applied only to actions "brought by the Attorney General, a district attorney, or a city prosecutor," but *Bank of the West* did not address that issue and the court's brief discussion of section 533.5 and its history is not conclusive.

9

attorney, any city prosecutor, or any county counsel" modifies only civil actions or proceedings brought under the UCL and FAL, not criminal actions. (*Id.* at p. 1421 (dis. opn. of Kozinski, J.).) The dissent noted that "the phrase 'any criminal action or proceeding' is separated by the disjunctive 'or' from actions brought pursuant to" the UCL and the FAL. (*Ibid.*) Neither the majority nor the dissent in *Bodell* discussed or engaged in the three-step analysis for statutory interpretation under California law.

### b. *California law for interpreting statutes*

"We begin with the fundamental rule that our primary task is to determine the lawmakers' intent." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) "In construing statutes, we aim 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.'" (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77 (*Klein*), quoting *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715.) California courts "have established a process of statutory interpretation to determine legislative intent that may involve up to three steps." (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 786-787 (*Alejo*).) The "key to statutory interpretation is applying the rules of statutory construction in their proper sequence . . . as follows: 'we first look to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction.'" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082 (*MacIsaac*), quoting *Riverview Fire Protection Dist. v. Workers' Comp. Appeals Bd.* (1994) 23 Cal.App.4th 1120, 1126.)

"The first step in the interpretive process looks to the words of the statute themselves." (*Alejo*, *supra*, 212 Cal.App.4th at p. 787; see *Klein*, *supra,* 50 Cal.4th at p. 77 ["[w]e look first to the words of the statute, 'because the statutory language is generally the most reliable indicator of legislative intent'"].) "If the interpretive question is not resolved in the first step, we proceed to the second step of the inquiry. [Citation.] In this step, courts may 'turn to secondary rules of interpretation, such as maxims of construction, "which serve as aids in the sense that they express familiar insights about conventional language usage."' We may also look to the legislative history. [Citation.]

10

'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' [Citation.] [¶] 'If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply "reason, practicality, and common sense to the language at hand." [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, "[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other matters, 'such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction.' [Citations.]" These "other matters" can serve as important guides, because our search for the statute's meaning is not merely an abstract exercise in semantics. To the contrary, courts seek to ascertain the intent of the Legislature for a reason—"to *effectuate the purpose* of the law."'" (*Alejo*, at pp. 787-788; see *MacIsaac, supra*, 134 Cal.App.4th at p. 1084.)

We do not necessarily engage in all three steps of the analysis. "It is only when the meaning of the words is not clear that courts are required to take a second step and refer to the legislative history." (*Soil v. Superior Court* (1997) 55 Cal.App.4th 872, 875; accord, *Sisemore v. Master Financial, Inc.* (2007) 151 Cal.App.4th 1386, 1411; see *MacIsaac*, *supra*, 134 Cal.App.4th at 1084 ["[i]f ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretative process"].)

### c. *Step one: Section 533.5 is not clear and unambiguous*

Mt. Hawley argues that the "plain language of the statute . . . is susceptible to only one, single, reasonable interpretation regarding the defense of criminal actions: that California law bars an insurance contract from providing for the defense of 'any criminal action or proceeding.'" According to Mt. Hawley, "the statutory language used and enacted by the Legislature has plain meaning" and "[t]here is no need to refer to extrinsic aids to interpretation, specialized rules of grammar, or legislative history."

11

In order for us to agree with Mt. Hawley, its proposed interpretation of section 533.5 must be not merely *more reasonable* than any other interpretation, Mt. Hawley's proposed interpretation must be the *only reasonable* interpretation of section 533.5. (See *Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 ["[i]f the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy"]; accord, *Bruns, supra,* (2011) 51 Cal.4th at p. 724; see *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1162-1163 (*Jones*) ["statutory language is not plain" where its "language does lend itself to plaintiff's interpretation, but . . . that is not the only reasonable interpretation of the statutory language"]; *Chosak v. Alameda County Medical Center* (2007) 153 Cal.App.4th 549, 561-562 [where both plaintiff's and defendant's proposed interpretations of statute were reasonable and "the statutory language can bear either meaning," the court proceeded "to a more detailed consideration of" the purpose and legislative history of the statute "to determine which of the proposed definitions best fits the intent of the Legislature in enacting the statute," even though one side's interpretation was "the most obvious" interpretation]; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 585-586 (*Ailanto Properties*) [because plaintiff's proposed interpretation of the statute was not "wholly unreasonable," statute was ambiguous and court would "turn to the second step of our inquiry and look to the statute's legislative history to clarify its meaning"].) Mt. Hawley's interpretation, however, is not the only reasonable one.

There are at least three reasonable interpretations of the statute. One reasonable interpretation, advocated by Mt. Hawley, is that section 533.5, subdivision (b), addresses "two separate and distinct types of actions:  any criminal action or proceeding (unqualified), or any action or proceeding brought pursuant to certain specific statutes in which the recovery of a fine, penalty or restitution is sought by certain state and local attorneys (as distinct from such actions brought by private parties)." Under this interpretation, "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel"

12

modifies "any action or proceeding brought pursuant to" the UCL or FAL, but not "any criminal action or proceeding." This interpretation precludes insurers from providing a defense in any criminal action, including a criminal action bought by federal prosecutors.

Another reasonable interpretation, advocated by Lopez and adopted by the majority in *Bodell*, is that section 533.5, subdivision (b), applies to "any criminal action or proceeding" "in which the recovery of a fine, penalty, or restitution is sought by" the four California state and local public agencies listed in the statute, or to "any action or proceeding brought pursuant to [the UCL or the FAL] in which the recovery of a fine, penalty, or restitution is sought by" the four state and local public agencies. Under this interpretation, "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" modifies both "any criminal action or proceeding" and "any action or proceeding brought pursuant to [the UCL and FAL]." This interpretation precludes insurers from providing a defense in criminal or civil actions brought by the state and local agencies listed in the statute, but not in criminal or civil actions brought by federal prosecuting agencies.

Yet another reasonable interpretation, urged by neither Mt. Hawley at all nor by Lopez directly, is that section 533.5, subdivision (b), applies to "any claim" in either a criminal action or proceeding or a UCL or FAL action or proceeding "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel." Under this interpretation, "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" modifies "any claim," whether the claim is part of a criminal, UCL, or FAL action or proceeding.

Thus, section 533.5, subdivision (b), is susceptible to at least these three reasonable interpretations. Even the dissenting judge in *Bodell* did not argue that the language of the statute is clear and unambiguous. (See *Bodell*, *supra*, 119 F.3d at

13

pp. 1421-1422 (dis. opn. of Kozinski, J.).)[7] Therefore, we cannot conclude that the language of the statute is clear and unambiguous, and we must proceed to the second step of the interpretive analysis and consider the purpose of the statute, the legislative history, and secondary rules of interpretation.

It may be that at first glance Mt. Hawley's proposed interpretation is more grammatically natural. Under the first step of the statutory interpretation analysis, however, that is not the test. The issue is whether Mt. Hawley's proposed interpretation is the only reasonable interpretation. And because it is not, we proceed to step two. (See *County of San Diego v. Alcoholic Beverage Control Appeals Bd.* (2010) 184 Cal.App.4th 396, 401 ["[w]hen the language is reasonably susceptible of more than one meaning, it is proper to examine a variety of extrinsic aids in an effort to discern the intended meaning," including, "for example, the statutory scheme, the apparent purposes underlying the statute and the presence (or absence) of instructive legislative history"].)

### d. Step two: The statute's legislative history, the circumstances of its enactment, and maxims of construction

As have the few courts that have considered section 533.5,[8] we now "proceed to the second step of the inquiry," looking to "the statute's legislative history," which "can be very instructive." (*People v. Nelson* (2011) 200 Cal.App.4th 1083, 1101; see *Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 586 ["[i]n the second step of our interpretive

---

[7] The dissenting judge in *Bodell* stated that he agreed with the insurers' argument that the phrase "'any criminal conduct or proceeding' is separated by the disjunctive 'or' from actions brought pursuant to California's unfair competition and false advertising statutes," which "makes perfect sense because such actions can be brought by both the government and private parties." (*Bodell*, *supra*, 119 F.3d at p. 1421 (dis. opn. of Kozinski, J.).) The dissent concluded that "[a]s applied to the specified civil actions, therefore, the list serves a useful function: It limits the statute's scope to unfair competition and false advertising actions brought by the government, not those by private parties." (*Ibid.*) We agree that this interpretation "makes sense" and is reasonable. But Lopez's proposed interpretation also makes sense and is reasonable.

[8] *Bodell*, *supra*, 113 F.3d at pages 1416 to 1417; *Bank of the West*, *supra*, 2 Cal.4th at pages 1270 to 1271; *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 837, footnote 15.

14

inquiry, we examine the entire history of the Legislature's enactment and amendment of the statute"].)  If a statute "is susceptible of multiple interpretations . . . we will divine the statute's meaning by turning to a variety of extrinsic sources, including the legislative history [citation], the nature of the overall statutory scheme [citation], and consideration of the sorts of problems the Legislature was attempting to solve when it enacted the statute [citation]." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 770.)  In addition, an "examination of the original text of the statute and the evolution of the language" of a statute that has been amended is "useful in ascertaining its current meaning." (*Ailanto Properties*, at p. 586.)

     i. Legislative history

  We look to the Legislative Counsel's digest and other summaries and reports indicating the Legislature's intent.  "Although the Legislative Counsel's summary digests are not binding, they are entitled to great weight." (*Van Horn v. Watson* (2008) 45 Cal.4th 322, 332, fn. 11; accord, *Jones*, *supra*, 42 Cal.4th at p. 1170; see *People v. Superior Court* (*Lavi*) (1993) 4 Cal.4th 1164, 1178 [Legislative Counsel's digest is indicative of legislative intent]; *Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1402.)  The Legislative Counsel's digest "constitutes the official summary of the legal effect of the bill and is relied upon by the Legislature throughout the legislative process," and thus "is recognized as a primary indication of legislative intent." (*Souvannarath v. Hadden* (2002) 95 Cal.App.4th 1115, 1126, fn. 9.)  In addition, "[c]ommittee reports are often useful in determining the Legislature's intent." (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 646; see *Tesco Controls, Inc. v. Monterey Mechanical Co.* (2004) 124 Cal.App.4th 780, 793.)  "In construing a statute, legislative committee reports, bill reports, and other legislative records are appropriate sources from which legislative intent may be ascertained." (*In re John S.* (2001) 88 Cal.App.4th 1140, 1144, fn. 2; see *Valley Vista Services, Inc. v. City of Monterey Park* (2004) 118 Cal.App.4th 881, 889 ["[w]hen construing a statute, we may consider its legislative history, including committee and bill reports, and other legislative records"].)  "Relevant material includes:  legislative

15

committee reports; Legislative Analyst's reports; and testimony or argument to either a house of the Legislature or one of its committees," but "[m]aterial showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered." (*Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403, 1425-1426.)

## A. The 1988 enactment of section 533.5

The legislative history of section 533.5 reveals two unmistakable and undisputed facts about the 1988 statute. First, the Legislature intended the statute to apply equally to civil and criminal actions brought by the three (at the time) listed state and local public entities that seek to recover a fine, penalty or restitution, and not to actions brought by federal agencies. As originally enacted in 1988, section 533.5, subdivision (b), applied to "any claim in any civil or criminal action or proceeding in which the recovery of a fine, penalty, or restitution is sought by" the Attorney General, a district attorney, and a city prosecutor. The Legislative Counsel's digest states that Assembly Bill No. 3920 (AB 3920), the bill that would become section 533.5, "would prohibit insurance coverage or indemnity for the payment of any fine, penalty, or restitution in any civil or criminal action or proceeding brought by specified law enforcement entities . . . ." (Legis. Counsel's Dig., AB 3920 (1987-1988 Reg. Sess.) at p. 1.)

Committee analyses and reports confirm the Legislative Counsel's understanding. (See *Ailanto Properties*, *supra*, 142 Cal.App.4th at pp. 589-590.) An analysis for the Assembly Committee on Finance and Insurance stated that AB 3920 would prohibit "any policy of insurance providing, or being construed to provide, coverage or indemnity for the payment of fine, penalty, or restitution in any civil or criminal action brought by the Attorney General, district attorney, or city attorney regardless of what the policy says." (Assem. Com. on Finance and Ins., Analysis of AB 3920 (1987-1988 Reg. Sess.) Apr. 19, 1988, p. 1.) The bill also would prohibit "any insurance policy from providing, or being construed to provide, any duty to defend any claim" "in any civil or criminal action brought by" the three specified public entities. (*Ibid.*) Thus, as the Supreme Court noted in 1990, the original version of section 533.5 "on its face . . . [did] not apply to relief

16

sought by the *federal* government . . . ." (*AIU Ins. Co., supra,* 51 Cal.3d at p. 837, fn. 15 [emphasis in original]; see *Bank of the West*, *supra*, 2 Cal.4th at p. 1271.)

Second, the Legislature enacted section 533.5 to address a problem the Attorney General had encountered (only) in UCL and FAL actions and to address a specific problem that public entities were experiencing when they brought unfair competition or false advertising actions, whether civil or criminal, against individuals and businesses. According to the Attorney General, the bill's sponsor and principal supporter, section 533.5 was intended to facilitate "the consumer protection activities of our office and local district attorneys and city attorneys." (See *Catlin v. Superior Court* (2011) 51 Cal.4th 300, 305-306 [considering a letter to Senate and Assembly Committees on Public Safety expressing the Attorney General's concerns about proposed legislation as part of the legislative history].)

The Attorney General argued to the Assembly Committee on Finance and Insurance that the proposed new law would address "a problem which arises under current law when the Attorney General or a district attorney seeks to enforce [the UCL and FAL]," because "[i]n many instances" the defendants were claiming "that the conduct involved is covered by their business insurance policy." (Office of the Atty. Gen., Stmt. AB 3920 before Assem. Com. on Finance and Ins. (1989-1990 Reg. Sess.) Apr. 19, 1988.) The Attorney General complained that defendants "tendered the defense of the action[s] to insurers whose policies provide general liability coverage which may include coverage for advertising and unfair competition claims." (Office of the Atty. Gen., Bill Proposal Summary of AB 3920 (1989-1990 Reg. Sess.) (undated) at p. 1.) The public entity then found itself litigating with an insurance company, "rather than the individual whose conduct violated provisions of the Business & Professions Code," a practice that made "no public policy sense." (Office of the Atty. Gen., Stmt. AB 3920 before Assem. Com. on Finance and Ins. (1989-1990 Reg. Sess.) Apr. 19, 1988.) These cases became "impossible to settle because the defendants refuse[d] to make restitution of unlawfully obtained property or to pay any civil penalty out of their own funds," and law enforcement agencies would not accept any settlement "paid by the insurer because such

17

a settlement does not impose any penalty for unlawful conduct directly on the defendant and permits the defendant to retain the ill-gotten gains . . . . [¶] As a result, the cases consume a large measure of prosecutorial resources during extensive litigation financed without cost to the defendant by the insurer which should have no obligation to pay the judgment ultimately awarded." (Office of the Atty. Gen., Bill Proposal Summary of AB 3920, *supra*, at p. 1.) For this reason, the Attorney General proposed and urged the Legislature to enact section 533.5 "'to hold individuals personally accountable for behavior [that] constitutes an unfair business practice or false and misleading advertising," in order to avoid "the litigation becom[ing] a contest between the public entity and the insurance company in which the involvement of the person whose conduct is at issue is almost negligible.'" (Assem. Com. on Finance and Ins., Analysis of AB 3920, *supra,* at p. 2.)

The Attorney General also argued to the Assembly Committee on Finance and Insurance and the Senate Insurance Committee that "[m]ost businesses purchase insurance to protect against losses arising from the operation of the business. Although existing law expressly prohibits insurance for losses incurred as a result of an insured's willful misconduct, the Attorney General's office frequently encounters problems enforcing [the UCL and FAL] because business defendants claim that the conduct involved is covered by their business insurance policies. If there is any ambiguity as to the potential liability of the insurance company, and there often is because there is no statute expressly dealing with this issue, the insurance company is obligated to defend the business. [¶] . . . [¶] Instead of individual accountability, the litigation becomes a contest between the public entity and the insurance company in which the involvement of the person whose conduct is at issue is almost negligible." (Office of the Atty. Gen., letters to Assemblyman Patrick Johnston, Chair of the Assem. Com. on Finance and Ins., and Senator Alan Robbins, Chair of The Senate Ins. Com. AB 3920, Apr. 12, 1988, pp. 1-2.) The Attorney General explained that "[c]ases brought under [the UCL and FAL] do not involve the private victim's right to compensation for losses. Rather, the public entities are seeking civil and/or criminal penalties, fines, and perhaps restitution as well. No

18

legitimate public purpose is served by allowing such fines and penalties to be paid by insurance companies; nor is there any valid purpose served by forcing insurance companies to provide defenses in such cases solely because the insurance policy coverage is ambiguous." (Office of the Atty. Gen., letters to Assemblyman Patrick Johnston and Senator Alan Robbins AB 3920, Apr. 12, 1988, at p. 2.)

B. The 1990 amendment

In 1990 the Legislature amended section 533.5, subdivision (b), by enacting what was referred to as a "clean-up bill" from the Attorney General, Assembly Bill No. 3334 (AB 3334). The legislative history reveals two unmistakable and undisputed facts about the 1990 amendment.

First, the legislative history makes clear that the Legislature did not intend the 1990 amendment to the statute to expand the reach of section 533.5, subdivision (b). The Legislative Counsel's digest stated that the bill to amend section 533.5 was designed to "restrict the civil actions to which those limitations apply . . . ." (Legis. Counsel's Dig., AB 3334 (1989-1990 Reg. Sess.) Stats. 1990, ch. 1512.) The Assembly Committee on Finance and Insurance analysis stated that AB 3334, "like its 1988 predecessor, is sponsored by the Attorney General, to reinforce the notion that person[s] violating our unfair competition and unfair advertising law may not use their insurance coverage to evade the personal consequences of wrongdoing. This proposition is not in controversy." (Assem. Com. on Finance and Ins., Analysis of AB 3334 (1989-1990 Reg. Sess.) Apr. 17, 1990, p. 1.) The committee analysis stated that the amendment "seeks to conform current law to its originally declared purpose while avoiding any adverse effect, one way or another, upon other issues of insurance contract coverage." (*Id.* at p. 2.) There is nothing in the legislative history indicating that the Legislature intended to expand the scope of the statute. (See *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 597 ["the *absence* of legislative history [can] be of significance in deciphering legislative intent"], citing *Jones*, *supra*, 42 Cal.4th at p. 1169; *Starving Students, Inc. v. Department of Industrial Relations* (2005) 125 Cal.App.4th 1357, 1363 [court can consider "the presence (or absence) of instructive legislative history"].)

19

Second, the Legislature intended the 1990 amendment to address a specific problem that state and local public entities had encountered arising from insurance companies' use of section 533.5, subdivision (b), to avoid paying for environmental cleanup costs. The new problem arose because of "the use of the overbroad civil action reference," which created "other insurance coverage issues . . . which were not remotely considered by the Legislature in connection with the 1988 legislation . . . ." (Assem. Com. on Finance and Ins., Analysis of AB 3334, *supra*, at p. 2.) This coverage issue arose because insurers were arguing in court that section 533.5 precluded and excused them from providing coverage under a "Comprehensive General Liability Policy for the cost of toxic waste cleanup when a business is sued by the state or federal government . . . ." (*Ibid.*) As the Assembly Finance and Insurance Committee Republican Analysis explained, the original statute "prohibited insurers from paying for fines arising from unfair business practices. Since then it has been interpreted to prevent insurers to cover [*sic*] certain toxics costs. That was never the author's or the sponsor's intent. This bill clarifies that." (Assem. Com. on Finance and Ins., Republican Analysis of AB 3334 (1989-1990 Reg. Sess.) Apr. 10, 1990.)

The Attorney General, who proposed the 1990 amendment as he had the original 1988 legislation, argued to the Assembly Finance and Insurance Committee that "Insurance Code section 533.5 was proposed due to the concerns about insurance companies being involved, on behalf of insured businesses, in the defense and settlement of cases brought under the unfair competition and false advertising statutes." (Office of the Atty. Gen., letter to Assemblyman Patrick Johnston, Chair of the Assem. Finance and Ins. Com. AB 3920, Apr. 10, 1990, p. 1.) The problem in 1988, the Attorney General noted, was that "businesses were unwilling to pay penalties or restitution to defrauded customers out of their own funds, as long as they had [] pending claims against insurance companies," which meant that "unfair competition and false advertising cases were dragging out and consuming a large measure of prosecutorial resources." (*Ibid.*) The Attorney General explained that, to resolve these problems, the Legislature enacted section 533.5, which "prohibits insurance coverage for fines, penalties, and restitution in

20

any civil or criminal action brought by the Attorney General, district attorneys, and city attorneys." (*Ibid.*)

In the area of environmental cleanup costs, however, insurers were taking the position "that state agencies are precluded from arguing that damages within the meaning of the typical liability policy include environmental clean up costs because such costs are in the nature of equitable restitution." (Office of the Atty. Gen., letter to Assemblyman Patrick Johnston, Chair of the Assem. Finance and Ins. Com. AB 3920, *supra*, p. 2.) Thus, insurance companies were interpreting "restitution more broadly in order to restrict their liability" for environmental cleanup costs. (*Ibid.*) This was not the intent of the original statute, and the Attorney General argued that "AB 3334 would clarify the original intent" of section 533.5 and "preserve the potential of maximizing recovery of public funds expended pursuant to statutory programs, such as the superfund regarding release of hazardous substances into the environment . . . ." (*Ibid.*)

The Assembly Finance and Insurance Committee also considered a lengthy memorandum from the Environmental Section of the Attorney General's Office entitled "Bill Proposal:  Hazardous Waste Insurance." (See *People v. Cruz* (1996) 13 Cal.4th 764, 773, fn. 5 ["it is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it"].) This memorandum stated that "section 533.5 . . . prohibits insurance coverage for fines, penalties and restitution in any civil or criminal action brought the Attorney General, district attorneys and city attorneys. The Environmental Section proposes an amendment to clarify that section 533.5 is directed at criminal actions and civil law enforcement actions brought under [the UCL and FAL] and does not apply to actions filed under state and federal hazardous substance and hazardous waste control laws." (Office of the Atty. Gen., Bill Proposal:  Hazardous Waste Ins., AB 3334 (1989-1990 Reg. Sess.) undated, p. 1.) The Attorney General noted that "[t]he problem at hand is that Insurance Code section 533.5 was not intended to address the currently active issue of toxic pollution insurance coverage, yet the statute has played,

21

and undoubtedly will continue to play[,] a role in resolving the coverage question." (*Id.* at p. 2.)

Thus, the use of the broad term "any civil action" in the 1988 statute was the problem because it covered more than just UCL and FAL civil actions. As the Attorney General noted, section 533.5 as originally drafted was "too broad, in that it affects many more regulatory activities than consumer protection . . . ." (Office of the Atty. Gen., Bill Proposal, *supra,* at p. 4.) The statute was supposed to solve a narrow problem in UCL and FAL actions brought by state and local agencies, but it created problems in other kinds of cases. As a result, the Legislature amended the statute so that the prohibition on providing a duty to defend applied to UCL and FAL actions, rather than all civil actions, which insurers were arguing included environmental cleanup actions. As the analysis of AB 3334 from the Assembly Committee on Finance and Insurance explained, the amendment "deletes the general references to civil actions in the 1988 Insurance Code amendments and, instead, substitutes more specific references to proceedings brought pursuant to those portions of the Business and Professions Code governing unfair competition and unfair advertising." (Analysis of AB 3334, *supra,* at p. 2.)

Of course, as is often the case with legislative histories, the legislative history of AB 3334 is not always entirely consistent. For example, an analysis prepared for the Senate Committee on Insurance, Claims and Corporations stated that the bill "clarifies that the prohibition against insurance to provide coverage or indemnity for the payment of any fine, penalty or restitution shall apply only to proceedings pertaining to unfair business practices or false or misleading advertisements rather than all civil actions, in addition to criminal actions." (Sen. Ins., Claims and Corps. Com., Analysis of AB 3334 (1989-1990 Reg. Sess.) Aug. 8, 1990, p. 1.) This fragment of the legislative history can be read to support Mt. Hawley's position that the 1990 amendment revised section 533.5 to bar insurers from providing a defense in (1) UCL and FAL actions seeking to recover a fine, penalty, or restitution, and (2) criminal actions. As explained above, however, the vast majority of the amendment's legislative history and the circumstances of its enactment do not support this interpretation. Indeed, the Senate committee analysis went

22

on to state that the amendment "is needed to avoid any adverse [e]ffects that may result as a misinterpretation of the unintended broad reference to 'any civil action.'" (*Id.* at p. 2.) The committee analysis also did not discuss the issue of what agency (state or federal) was bringing the action.

Mt. Hawley relies heavily on section 2 of AB 3334, which states that the Legislature's intent in 1988 in enacting section 533.5 was that it "shall be applicable to insurance coverage and to the duty to defend only in criminal actions and in actions or proceedings brought by the Attorney General, any district attorney, or any city prosecutor, pursuant to [the UCL and the FAL]." (AB 3334 (1989-1990 Reg. Sess.) Stat. 1990, ch. 1512, § 2, subd. (a), p. 2.) This statement suggests that the statute applies to (1) criminal actions and (2) civil actions under the UCL and FAL, as Mt. Hawley contends. This declaration in 1990 of what the Legislature had intended in 1988 is relevant to our inquiry but it is not binding. (See *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 131 ["the declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law"]; *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473 ["'a legislative declaration of an existing statute's meaning' is but a factor for a court to consider and 'is neither binding nor conclusive in construing the statute'"].) "Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts." (*Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 244 (*Western Security Bank*); see *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 480 [Legislature "has no legislative authority simply to say what it *did* mean," but "[c]ourts do take cognizance of such declarations when they are consistent with the original intent"].) In any event, it is undisputed that section 533.5, subdivision (b), as originally enacted in 1988, unambiguously applied only to actions brought by state and local agencies, and not to actions brought by federal agencies.

Moreover, there are other indications in the 1990 legislative record confirming that the Legislature had intended in 1988 that the original statute apply to civil or criminal actions brought by the three named state and local public entities that seek to recover a

23

fine, penalty or restitution. (See *Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 589, fn. 13 ["[w]e may properly rely on the legislative history of subsequent enactments to clarify the Legislature's intent regarding an earlier enacted statute," and, while the concept of "'subsequent legislative history' may seem oxymoronic, it is well established that 'the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them,'" quoting *Western Security Bank, supra,* 15 Cal.4th at p. 244]; *City of Long Beach v. California Citizens for Neighborhood Empowerment* (2003) 111 Cal.App.4th 302, 307, fn. 6 ["'[a]lthough a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed,'" quoting *Eu v. Chacon* (1976) 16 Cal.3d 465, 470].) For example, the Legislative Counsel's digest for AB 3334 stated that under "[e]xisting law . . . no policy of insurance shall provide any [duty to defend] any civil or criminal action or proceeding brought by the Attorney General, any district attorney, or any city prosecutor" for "the payment of any fine, penalty, or restitution." (Legis. Counsel's Dig., AB 3334, *supra.*) An analysis prepared for the Assembly Committee on Finance and Insurance stated that "California law, enacted by the adoption of Assembly Bill 3920 (Johnston) in 1988[,] provides that no policy of insurance shall provide coverage or indemnity for the payment of any fine, penalty, or restitution in any civil or criminal action brought by the Attorney General, any district attorney, or any city prosecutor . . . ." (Analysis of AB 3334, *supra,* at p. 1.) The committee analysis also confirmed that the purpose of AB 3920 in 1988 "was to 'hold individuals personally accountable for behavior which constitutes an unfair business practice or false and misleading advertising.'" (*Ibid.*)

These declarations and statements of prior legislative intent are relevant to our inquiry, but no individual expression is determinative. Section 2 of AB 3334 does not, as Mt. Hawley argues, definitively prove that the Legislature intended (in 1988 or 1990) that "the list of attorneys who are prosecuting an action modifies only those civil actions brought pursuant to the UCL and the [FAL]," and not criminal actions. The entirety of

24

the legislative history and purpose of the statute show that the Legislature enacted section 533.5 in 1988 to address actions brought by state and local agencies, and then amended section 533.5 in 1990 to limit—not expand—the application of the statute.

### C. The 1991 amendment

In 1991 the Legislature again amended section 533.5, subdivision (b), as part of Senate Bill No. 709 (SB 709). SB 709, sponsored by the County of San Bernardino, made a relatively minor change in the UCL by adding county counsel to the list of public entities that can bring UCL actions. The Legislative Counsel's digest states that the bill would allow "a county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance to prosecute an action for injunction to enjoin unfair competition." (Legis. Counsel's Dig., SB 709 (1990-1991 Reg. Sess.) Stat. 1990, ch. 1195.) The Legislative Counsel's digest also states that the bill would authorize the county to collect any fine recovered in such an action brought by a county counsel. (*Ibid.*) Although SB 709 was primarily about amending the UCL, the last section of the bill added county counsel to the group of public entities listed in section 533.5, subdivision (b). (SB 709 (1990-1991 Reg. Sess.) Stat. 1990, ch. 1195, § 4, subds. (a), (b), pp. 3-4.)

Most of the legislative history of SB 709 concerns the issue of adding county counsel to the list of public entities that can bring UCL actions. An analysis of SB 709 prepared for the Senate Committee on Judiciary explains that the bill "would provide that in addition to the Attorney General, the district attorney and the city attorney, any county counsel can bring an action for any violation of, or an injunction pursuant to, specified provisions [of the Unfair Trade Practices Act]." (Sen. Com. on Judiciary, Analysis of SB 709 (1990-1991 Reg. Sess.) May 14, 1991, p. 2.) This analysis contains one of the few references in the legislative history of SB 709 to section 533.5 and confirms that section 533.5, subdivision (b), applies to UCL actions brought by state and local agencies: "Existing law also provides that no policy of insurance shall provide, or be construed to provide[,] coverage or indemnity of the payment of any fine, penalty, or restitution in any action brought under unfair competition laws brought by the Attorney

25

General, any district attorney and city attorney." (*Ibid.*)  There is no indication in the legislative history that the Legislature intended in 1991 to preclude insurers from providing a defense in federal criminal actions, or for that matter in any actions other than UCL and FAL actions brought by state and local public entities.

### D.  The takeaway

The legislative history of the original 1988 statute and the 1990 and 1991 amendments makes it clear that the purpose of the statute, the circumstances of its enactment, and the Legislature's goal in enacting the statute, were to preclude insurers from providing a defense in civil and criminal UCL and FAL actions brought by the Attorney General, district attorneys, city attorneys, and (later) county counsel.  It is undisputed that the original version of section 533.5, subdivision (b), applied only to criminal and civil actions brought by the Attorney General, a district attorney, or a city attorney seeking the recovery of a fine, penalty, or restitution, and not to actions brought by federal agencies.  Although the original version of section 533.5, subdivision (b), did not specifically mention UCL and FAL claims, the Legislature enacted the original statute to address UCL and FAL actions.  It was in response to a perceived defect in the wording of the original statute, which allowed insurers to use the statute as a defense in environmental cleanup cases, that the Legislature in 1990 amended the statute to make it clear that the prohibition on providing a defense applied only in UCL and FAL cases brought by the three (and in 1991 four) named state and local agencies.  At no time did the Legislature ever intend section 533.5, subdivision (b), to apply to actions other than UCL and FAL actions brought by state and local agencies.[9]  At no time did the Legislature ever intend section 533.5, subdivision (b), to apply to criminal actions brought by public entities other than the three and then four enumerated state and local agencies, such as criminal actions brought by the federal prosecuting authorities.

---

[9]     Indeed, one federal court stated in 1993 that section 533.5 stands for the principle that there is "no insurance coverage or duty to defend in actions brought under Unfair Business Practices Act."  (*Standard Fire Ins. Co. v. Peoples Church of Fresno* (9th Cir. 1993) 985 F.2d 446, 449.)

26

Mt. Hawley's primary argument on the issue of legislative intent is that "there is no indication that the Legislature intended to distinguish federal from state criminal prosecutions and to permit an insurer-funded defense or indemnity for federal [crimes] while barring it for those brought by the State." As Lopez concedes, Mt. Hawley is correct: there is nothing in the legislative history suggesting that the Legislature intended or was even thinking about a distinction between state and federal criminal actions and proceedings. (See *People v. Taylor* (2007) 157 Cal.App.4th 433, 439 [noting that the "absence from the legislative history" of a distinction "supports our conclusion that no distinction was intended by the Legislature"].) But that is because the Legislature was thinking about UCL and FAL actions and proceedings, which only state and local agencies bring. As Lopez correctly argues, "[b]ecause federal prosecutors do not enforce the UCL, the Legislature had no reason to include them within the statute's ambit," and there was no need to distinguish or even consider actions brought by federal prosecutors. The Attorney General's expressed concern that UCL and FAL cases were consuming "a large measure of prosecutorial resources" was a concern about state resources, not federal resources. (Bill Proposal Summary of AB 3920, *supra,* at p. 1.) Indeed, the absence of any discussion regarding, concern about, or mention of federal prosecutions supports Lopez's position that the Legislature intended the original statute and the two amendments to apply only to criminal or civil UCL actions brought by the listed state and local agencies. As the Supreme Court stated in *Van Horn v. Watson* (2008) 45 Cal.4th 322, "one would expect that, had the Legislature intended to alter the scope of" a statute, "some mention of its intent would have made it into the legislative history. The absence of any such discussion suggests the Legislature did not so intend." (*Id.* at p. 332, fn. 12.)

ii.  Maxims of construction

As noted above, section 533.5, subdivision (b), precludes an insurer from defending "any claim in any criminal action or proceeding or in any action or proceeding brought pursuant to [the UCL or the FAL] in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel." Mt. Hawley argues that the "plain grammatical structure" of

27

section 533.5, subdivision (b), "compels the conclusion that the list of lawyers contained within the second 'in any' prepositional phrase qualifies only those types of actions described within that phrase," because of the "or" between "criminal action or proceeding" and "any action or proceeding brought pursuant to" the UCL or FAL.

Such grammatical and interpretive aids are important tools, but they are only tools. "The rules of grammar and canons of construction are but tools, 'guides to help courts determine likely legislative intent. [Citations] And that intent is critical. Those who write statutes seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.'" (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017-1018, quoting *J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Intl., Inc.* (2001) 534 U.S. 124, 156 [122 S.Ct. 593, 151 L.Ed.2d 508].) "Grammar and syntax thus are a means of gleaning intent, not a basis for preventing its effectuation." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 269; see *Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th 173, 183 ["[a] litigant may not make a 'fortress out of the dictionary' [citation], nor similarly employ the rules of grammar"].) Thus, "'[w]hile punctuation and grammar should be considered in interpreting a statute, neither is controlling unless the result is in harmony with the clearly expressed intent of the Legislature.'" (*Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 189, fn. 16.) Similarly, the "canons of construction . . . are not to be rotely applied in disregard of other indicia of the intent and purpose of the body which enacted the statutory provision in question." (*California Chamber of Commerce v. Brown* (2011) 196 Cal.App.4th 233, 258; see *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 (*Renee J.*) ["[p]rinciples of statutory construction are not rules of independent force, but merely tools to assist the courts in discerning legislative intent"].)

The human problems that the Legislature was seeking to solve with section 533.5 were first that insurers were providing their business insureds with an indemnity and a defense in UCL and FAL actions brought by state and local public entities, and then later that insurers were using section 533.5 to argue that they did not have to pay for

28

environmental cleanup costs.  The appearance in the 1990 amendment of the second "or any" phrase does not definitively show that the Legislature intended section 533.5, subdivision (b), to apply to all criminal actions, including federal criminal actions.  The legislative history is bursting with manifestations of intent to bar indemnity and defense for UCL and FAL actions brought by state and local agencies, and devoid of any indications that the bar would apply to criminal actions brought by federal agencies.  We cannot allow technical rules of grammar and construction to defeat the clear legislative intent behind section 533.5.  (See *Payless Shoesource, Inc. v. Travelers Companies, Inc.* (10th Cir. 2009) 585 F.3d 1366, 1371-1372 ["while the rules of English grammar often afford a valuable starting point to understanding a speaker's meaning, they are violated so often by so many of us that they can hardly be safely relied upon as the end point of analysis"].)

### A.   The last antecedent rule

Mt. Hawley places considerable reliance on the last antecedent rule.  The last antecedent rule provides that "'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.'" (*Renee J.*, *supra*, 26 Cal.4th at 743; see *Genlyte Group, LLC v. Workers' Comp. Appeals Bd.* (2008) 158 Cal.App.4th 705, 717 (*Genlyte Group*).)  Mt. Hawley argues that under the last antecedent rule the phrase "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" modifies "any action or proceeding brought pursuant to" the UCL or FAL, but not the first and more remote "any criminal action or proceeding."

The last antecedent rule, however, "is 'not immutable' and should not be 'rigidly applied' in all cases" and has several exceptions.  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2003) 107 Cal.App.4th 516, 530; see *In re Phelps* (2001) 93 Cal.App.4th 451, 456.)  One exception "provides that when several words are followed by a clause that applies as much to the first and other words as to the last, 'the natural construction of the language demands that the clause be read as applicable to all.' [Citation]  Another

provides that when the sense of the entire act requires that a qualifying word or phrase apply to several preceding words, its application will not be restricted to the last." (*Renee J.*, *supra*, 26 Cal.4th at p. 743.) These "exceptions to a rigid or mechanical application of the last antecedent rule . . . are simply another way of stating the fundamental rule that a court is to construe a statute to effectuate the purpose of the law." (*Genlyte Group*, *supra*, 158 Cal.App.4th at p. 717; see *Anderson v. State Farm Mut. Auto. Ins. Co.* (1969) 270 Cal.App.2d 346, 349-350 ["if the clear intent of the parties is opposed to the application of the rule, the rule must yield"].)

Both of these exceptions to the last antecedent rule apply here. The clause "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" applies "as much to" "any criminal action or proceeding" as to "action or proceeding brought pursuant to [the UCL and FAL]." (See *Lickter v. Lickter* (2010) 189 Cal.App.4th 712, 726 [last antecedent rule did not apply because qualifying phrase "is just as applicable to the more remote [words] . . . as it is to the immediately preceding term"].) With the exception of county counsel (which we discuss below), the named public entities can bring both criminal actions and civil actions under the UCL and FAL, and can seek fines and restitution in criminal actions and penalties in civil actions. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 ["[i]n a suit under the UCL, a public prosecutor may collect civil penalties"]; *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17 [prosecutors can seek restitution under the FAL]; *People v. First Federal Credit Corp.* (2002) 104 Cal.App.4th 721 [district attorney sought civil penalties under the UCL and FAL].)

In addition, the goal of the legislation that enacted and amended section 533.5, subdivision (b), was to bar insurers from providing a defense in UCL and FAL actions but not in environmental actions brought by state agencies seeking fines, penalties, and restitution. In light of this goal, the "sense" of the entire statute requires that the phrase "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" apply to the words "any

30

criminal action" and "not be restricted to" civil UCL and FAL actions and proceedings. (See *Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 154-155 ["[t]he last antecedent rule does not trump" considerations of "the spirit of the statute . . . as a whole"].)  There is no indication or "sense" that the Legislature ever intended the statute to apply to criminal actions brought by federal prosecutors, who do not bring actions seeking recovery of a fine, penalty, or restitution under the UCL or the FAL.  The last antecedent rule does not mandate an interpretation that section 533.5, subdivision (b), applies to federal criminal actions.[10]

### B.  Other maxims

"Statutory language is not considered in isolation.  Rather, we 'interpret the statute as a whole, so as to make sense of the entire statutory scheme.'" (*Bonnell v. Medical Bd. of California* (2003) 31 Cal.4th 1255, 1261.)  We must also "interpret legislative enactments so as to avoid absurd results." (*People v. Torres* (2013) 213 Cal.App.4th 1151, 1158.)  Relying heavily on and quoting extensively from the dissenting opinion in *Bodell*, Mt. Hawley argues that the use of the word "recovery" in the phrase "in which the recovery of a fine, penalty, or restitution is sought" by the named public agencies "reinforces [the] insurers' view that the list of lawyers applies only to civil actions" because a "prosecutor doesn't seek 'recovery' of a conviction in a criminal case." (*Bodell*, *supra*, 119 F.3d at p. 1421 (dis. opn. of Kozinski, J.).)

---

[10]    A third exception to the last antecedent rule is the presence of a comma between all of the antecedents and the qualifying phrase (here, between "any criminal action or proceeding" and "any action or proceeding brought pursuant to" the UCL and FAL, and "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel").  There is no comma in section 533.5, subdivision (b), between the two antecedents and the qualifying phrase.  Nevertheless, just because the punctuation of a statute "[a]dmittedly . . . is not punctilious" does not justify blind adherence to the last antecedent rule.  (*Absher v. AutoZone, Inc.* (2008) 164 Cal.App.4th 332, 344; see *U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.* (1993) 508 U.S. 439, 454 [113 S.Ct. 2173, 124 L.Ed.2d 402] ["a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning"].)

Prosecutors, however, do seek recovery of fines and restitution as a result of a conviction in general, and in UCL and FAL cases in particular. (See, e.g., Bus. & Prof. Code, § 17500 [violation punishable by imprisonment in county jail not to exceed six months, a fine not to exceed $2,500, or both]; *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1324 [prosecutor sought victim restitution].) Indeed, prosecutors can waive the imposition of a fine if they do not request it or do not object when the trial court fails to impose it. (See *People v. Tillman* (2000) 22 Cal.4th 300, 302-303.) And restitution hearings in criminal cases cannot proceed in the absence of the prosecutor, even if the victim is present with counsel. (See *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1386, 1389 ["[r]estitution hearings held pursuant to section 1202.4 are sentencing hearings and are thus hearings which are a significant part of a criminal prosecution," and the "goals of a restitution hearing . . . can only be accomplished with the participation of the district attorney acting in accordance with his responsibilities to the criminal justice system"]; see also *People v. Smith* (2011) 198 Cal.App.4th 415, 434 ["[t]he restitution hearing, whether for economic or noneconomic damages, is a criminal sentencing hearing, not a civil trial"].)

Moreover, the phrase "in which the recovery of a fine, penalty, or restitution is sought by the Attorney General, any district attorney, any city prosecutor, or any county counsel" cannot modify only "any action or proceeding brought pursuant to [the UCL and FAL]," because fines are not recoverable in civil UCL and FAL actions. Only public entities can prosecute a violation of the UCL and FAL as a misdemeanor and seek a fine pursuant to Business and Professions Code section 17500. (See *Kasky v. Nike, Inc.*, *supra,* 27 Cal.4th at p. 950 ["[i]n a suit under the UCL . . . a private plaintiff's remedies are 'generally limited to injunctive relief and restitution,'" quoting *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179]; *Lavie v. Proctor & Gamble Co.* (2003) 105 Cal.App.4th 496, 503 ["Attorney General and district attorneys . . . are authorized to prosecute violations of the UCL criminally (see Bus. & Prof. Code, § 17500) and may also seek redress through the bringing of civil law enforcement cases seeking equitable relief and civil penalties

beyond those available to private parties (see Bus. & Prof. Code, §§ 17203, 17206, 17535, 17536)"]; *People v. Municipal Court* (1972) 27 Cal.App.3d 193, 201-202 ["crimes are considered to be offenses against the body politic for which the punishment is fine or imprisonment as distinguished from civil wrongs where private redress is obtained through individually prosecuted lawsuits for damages"].)  Because fines can only be sought in criminal cases, the phrase must also modify "any criminal action or proceeding," consistent with the maxim of construction that "our interpretation is faithful to the canon that we must 'interpret a statute consistently with the meaning derived from its grammatical structure.'" (*Moore v. Hill* (2010) 188 Cal.App.4th 1267, 1281.)  If, as Mt. Hawley argues, the phrase modified only "any action or proceeding brought pursuant to [the UCL and FAL]," then the Legislature would have had no reason to include the word "fine" in the statute, thus violating another maxim of construction.  (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1135 ["rule of statutory interpretation [is] that courts should avoid a construction that makes any word surplusage"]; *Kulshretha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 611 ["courts may not excise words from statutes"]; *Moss v. Kroner* (2011) 197 Cal.App.4th 860, 879 ["[i]t is a settled axiom of statutory construction that significance should be attributed to every word and phrase of a statute, and a construction making some words surplusage should be avoided"].)

Again quoting the dissenting opinion in *Bodell*, Mt. Hawley argues that the interpretation we are adopting "makes no sense because at least one of the lawyers listed (the county counsel) cannot bring criminal charges," that the "circumstances under which 'county counsel' was added to the list conclusively undermines the notion that the list has any relevance to criminal prosecutions," and that "the list only includes those lawyers who are authorized to bring unfair competition and false advertising actions, and has nothing at all to do with criminal prosecutions." (*Bodell*, *supra*, 119 F.3d at p. 1421 (dis. opn. of Kozinski, J.).)  This argument misunderstands the 1991 amendment.  The "circumstances under which 'county counsel' was added to the list" were that the Legislature was amending the UCL to allow county counsel to file UCL actions, and amended section 533.5, subdivision (b), accordingly.  This history supports the

33

conclusion that the Legislature enacted section 533.5 to address the problem of insurers providing indemnification and defense in UCL and FAL actions, and to prevent insurers from litigating against state prosecutors in these kinds of cases, not to prevent insurers from providing a defense to insureds in all criminal cases. (See *Wotton v. Bush* (1953) 41 Cal.2d 460, 467 ["the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation"]; *All Angels Preschool/Daycare v. County of Merced* (2011) 197 Cal.App.4th 394, 403 [where "the plain wording does not answer our question of interpretation, it is appropriate to consider extrinsic aids such as the apparent objective to be achieved and the evils to be remedied by the entire" statute].) Moreover, because county counsel can bring claims, "county counsel" can modify the first "any claim" in section 533.5, subdivision (b). In any event, when the Legislature amended the UCL and section 533.5, subdivision (b), in 1991 to add county counsel to the statute, the Legislature had to put county counsel somewhere, and with the Attorney General, district attorney, and city attorney was the only realistic place county counsel would fit in the statute.

### e. *Step three: Reason, practicality, and common sense*

Although it is not necessary to do so, we confirm our interpretation of section 533.5, subdivision (b), by applying "reason, practicality, and common sense to the language" of the statute. (See *Brown v. Valverde* (2010) 183 Cal.App.4th 1531, 1552 [although "we need not reach [the] second and third steps" in the analysis, "[w]e nevertheless discuss them . . . as they lend strong support to our conclusion"]; *Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 591 ["[a]lthough our review of the legislative history suffices to support our conclusion, applying 'reason, practicality, and common sense to the language at hand' confirms that conclusion"].)

Outside the special area of UCL and FAL actions brought by state and local prosecuting agencies, there is no public policy in California against insurers contracting to provide a defense to insureds facing criminal charges, as opposed to indemnification for those convicted of criminal charges. (See *Stein v. Internat. Ins. Co.* (1990) 217 Cal.App.3d 609, 615 ["[w]hile nothing would preclude [the insurer] from choosing"

34

to defend the insured's criminal action, "it is a judgment call to be left solely to the insurer"]; *Ohio Casualty Ins. Co. v. Hubbard* (1984) 162 Cal.App.3d 939, 944 (*Ohio Casualty Ins. Co.*) ["'[an] insurer is not absolved from its duty to *defend* the lawsuit merely because it is forbidden by law or contract to indemnify the liability-causing action'"].)  Section 533.5 did not change that law outside of the context of certain actions brought by the listed state and local agencies.[11]

To the contrary, courts have held that section 533, a similar but much older statute (enacted in 1935) that prohibits indemnification "for a loss caused by the wilful act of the insured," does not extinguish an insurer's duty to defend an insured accused of those wilful actions.  (See *Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 277-278 ["a contract to defend an assured upon mere accusation of a wilful tort does not encourage such wilful conduct"]; *State Farm General Ins. Co. v. Mintarsih* (2009) 175 Cal.App.4th 274, 287 [although "section 533 precluded indemnification . . . coverage" for malicious prosecution, "section 533 did not relieve the insurer of the contractual duty to defend that claim"]; *Marie Y. v. General Star Indemnity Co.* (2003) 110 Cal.App.4th 928, 959 ["[e]ven though public policy or section 533 precludes an insurer from indemnifying an insured in an underlying action the duty to defend still exists so long as the 'insured reasonably expect[s] the policy to cover the types of acts involved in the underlying suit'"]; *Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 878 (*Mez Industries*) ["where a denial of indemnification is based on the application of section 533, it does not necessarily follow that no duty to defend exists"]; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 508 (*Downey Venture*) ["[o]bviously, the public policy concerns applicable to an insurer's indemnification" of a malicious prosecution action because of section 533 "do not extend to the provision of a defense"]; *B & E*

---

[11]  Indeed, the Legislative Counsel's digest for AB 3920 stated that the new statute's provisions did "not constitute a change in, but are declaratory of, the existing law." (Legis. Counsel's Dig., AB 3920, *supra*, at p. 1.)  Existing law in 1988 did not preclude insurance companies from providing a defense, as opposed to indemnity, for criminal charges.

*Convalescent Center v. State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 93
["[p]ut another way, if the reasonable expectations of an insured are that a defense will be provided for a claim, then the insurer cannot escape that obligation merely because public policy precludes it from indemnifying [it]"].)[12] So for example in *Jaffe v. Cranford Ins. Co.* (1985) 168 Cal.App.3d 930 (*Jaffe*), the insurer argued that, "since the policy excludes payment for damages resulting from criminal acts, legal defense to criminal charges is also excluded" and that section 533 was "in accord with the policy." (*Id.* at p. 935 & fn. 9.) The court disagreed, concluding that, although "the policy behind section 533 would prohibit coverage for fines resulting from a criminal conviction," section 533 only "restricts the possible liability of insurers for losses. It does not restrict the insurer's right to contract to provide legal services. [Citation.] Nor do we think the policy behind section 533 necessarily precludes such coverage." (*Id.* at p. 935, fn. 9.) Thus, while it is true, as Mt. Hawley argues, that "California law recognizes a strong public policy of discouraging certain types of conduct by barring insurance coverage for any resulting proceedings or damages," that public policy applies to indemnification not defense.[13]

---

[12] The same is true for section 1668 of the Civil Code, assuming, as Mt. Hawley contends, that it applies to insurance policies. This section provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (See *Downey Venture*, *supra*, 66 Cal.App.4th at pp. 486, fn. 1, 492; *J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 14; *Ohio Casualty Ins. Co.*, *supra,* 162 Cal.App.3d at pp. 945-946; see also *St. Paul Fire & Marine Ins. Co. v. Weiner* (9th Cir. 1979) 606 F.2d 864, 870.) "However, it is not at all clear that section 1668 applies to indemnity agreements such as an insurance policy." (*Downey Venture,* at p. 486, fn. 1.)

[13] Where section 533 precludes indemnification and there is no "reasonable expectation of a defense even though indemnification is excluded," there is no duty to defend. (*Mez Industries, supra*, 76 Cal.App.4th at p. 878; see *Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 621-622.) Where, however, there is a "separate promise to defend against an inherently intentional tort," the insurer can still owe a duty to defend even if section 533 precludes a duty to indemnify. (See *Uhrich*, at p. 622; *Mez Industries*, at p. 878, fn. 21; *Downey Venture, supra,* 66 Cal.App.4th at

36

Mt. Hawley, quoting the dissenting opinion in *Bodell,* argues that Lopez's interpretation of section 533.5, subdivision (b), would create a conflict with subdivision (a) of section 533.5, "which contains a parallel construction" precluding "coverage or indemnity for the payment of any fine, penalty, or restitution in any criminal action or proceeding or in any action or proceeding brought pursuant to" the UCL or FAL by the same four state agencies.[14] Mt. Hawley argues that if we adopt Lopez's proposed interpretation of subdivision (b), then we would have to interpret subdivision (a) to "mean that insurance coverage would be barred for indemnification for criminal fines, penalties and restitution, only for criminal actions brought by the state but not the federal government." As the dissenting opinion in *Bodell* rhetorically asks, "Why would indemnification of criminal fines imposed under federal law create any less of a moral hazard than indemnification of fines imposed under state law?" (*Bodell*, *supra*, 119 F.3d at p. 1411 (dis. opn. of Kozinski, J.).)

The alleged conflict with subdivision (a) is a false issue. Section 533 precludes indemnification of criminal fines, state and federal. (See *California Casualty Management Co. v. Martochhio* (1992) 11 Cal.App.4th 1527, 1533 [§ 533 precludes coverage "for fines or restitution imposed as a result of a criminal conviction"]; *Jaffe, supra,* 168 Cal.App.3d at p. 935, fn. 9 ["policy behind section 533 would prohibit coverage for fines resulting from a criminal conviction"].) Our interpretation of section 533.5, subdivision (b), has no effect on that rule. The Legislature enacted section 533.5

---

pp. 507-508.) Here, the policy includes a separate promise to defend criminal actions "even if any of the allegations are groundless, false or fraudulent. "

[14] Section 533.5, subdivision (a), provides: "No policy of insurance shall provide, or be construed to provide, any coverage or indemnity for the payment of any fine, penalty, or restitution in any criminal action or proceeding or in any action or proceeding brought pursuant to Chapter 5 (commencing with Section 17200) of Part 2 of, or Chapter 1 (commencing with Section 17500) of Part 3 of, Division 7 of the Business and Professions Code by the Attorney General, any district attorney, any city prosecutor, or any county counsel, notwithstanding whether the exclusion or exception regarding this type of coverage or indemnity is expressly stated in the policy."

to address the problem the Attorney General had been experiencing in UCL and FAL cases, not to allow indemnification of federal criminal fines. Our conclusion that subdivision (b) does not preclude an insurer from providing a defense to federal criminal charges does not create any disharmony with subdivision (a). (See *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 218 ["[r]elated provisions 'should be read together and construed in a manner that gives effect to each, yet does not lead to disharmony with others'"]; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 933 ["when interpreting a statute, we must harmonize its various parts if possible, reconciling them in the manner that best carries out the overriding purpose of the legislation"].)

Moreover, the Legislature has enacted statutes authorizing insurance that provides a defense to individual defendants in various kinds of proceedings, including criminal proceedings. For example, Corporations Code section 317 authorizes a corporation to indemnify certain of its agents against "expenses, judgments, fines, settlements, and other amounts," including "expenses actually and reasonably incurred by that person in connection with the defense or settlement of the action . . . ." (Corp. Code, § 317, subds. (b), (c).)[15] Corporations Code section 317 applies to criminal proceedings against the agent as long as "that person acted in good faith and in a manner the person reasonably believed to be in the best interests of the corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of the person was unlawful." (Corp. Code, § 317, subds. (a), (b); see *P. S. & S. Inc. v. Superior Court* (1971) 17 Cal.App.3d 354, 359 [predecessor to Corp. Code, § 317]; 1 Marsh's Cal. Corporate Law (4th ed. 2006) §11.22).) The statute further provides that the corporation

---

[15] Similar to an insurer's right to provide a defense subject to a reservation of rights, the corporation is entitled to condition the advance of defense costs on behalf of its agent on the filing by the agent of a bond in case it is subsequently determined that the agent was not entitled to indemnification and defense under the statute. (See Corp. Code, § 317, subd. (f) ["[e]xpenses incurred in defending any proceeding may be advanced by the corporation prior to the final disposition of the proceeding upon receipt of an undertaking by or on behalf of the agent to repay that amount if it shall be determined ultimately that the agent is not entitled to be indemnified as authorized in this section"].)

"shall have power to purchase and maintain insurance on behalf of any agent of the corporation against any liability asserted against or incurred by the agent in that capacity or arising out of the agent's status . . . ." (Corp. Code, § 317, subd. (i).) Thus, Corporations Code section 317 embodies a policy decision by the Legislature to allow insurers in certain circumstances to provide a defense in criminal actions or proceedings. (See *Wilshire-Doheny Associates Ltd. v. Shapiro* (2000) 83 Cal.App.4th 1380, 1388-1389 ["[t]he policy considerations behind [Corp. Code §] 317 'are that persons who serve the corporation in good faith should, in the absence of certain conduct (fraud, breach of fiduciary duties, etc.) be free from liability for corporate acts; indemnification encourages capable persons to perform their duties, secure in the knowledge that expenses incurred by them despite their honesty and integrity will be borne by the corporation'"]; *Channel Lumber Co. v. Porter Simon* (2000) 78 Cal.App.4th 1222, 1231 [by enacting Corp. Code, § 317 the Legislature made a policy decision "to encourage capable individuals to act for and in the place of the corporation by affording them indemnification for the expenses of defending against lawsuits to which they are made parties because they are agents of the corporation"].)

Similarly, Government Code section 990 provides that a local public entity may "[i]nsure, contract or provide against the expense of defending a claim against the local public entity or its employee . . . where such liability arose from an act or omission in the scope of his employment, and an insurance contract for such purpose is valid and binding notwithstanding Section 1668 of the Civil Code, Section 533 of the Insurance Code, or any other provision of law." (Gov. Code, § 990, subd. (c).) Government Code section 995.8 provides that "a public entity may provide for the defense of a criminal action or proceeding . . . brought against an employee or former employee if" the "criminal action or proceeding is brought on account of an act or omission in the scope of his employment as an employee of the public entity . . . ."[16] (Gov. Code, § 995.8; see *Los Angeles Police*

---

[16] The public entity must also determine that such a defense would be in its best interest and that "the employee or former employee acted, or failed to act, in good faith,

39

*Protective League v. City of Los Angeles* (1994) 27 Cal.App.4th 168, 176 [Gov. Code, § 995.8 "declares that public entities are not required to provide for the defense of criminal actions brought against their employees, but instead permits the entities to provide defenses in certain circumstances"].)

Our interpretation of section 533.5 allows insurers to contract to provide a defense to certain kinds of criminal charges, as the Legislature has said insurers can do in the cases of corporate agents and government employees charged with crimes. Interpreting section 533.5, subdivision (b), as Mt. Hawley proposes and as the trial court did would create a potential conflict with statutes in the Corporations Code and the Government Code. (See *Broughton v. Cigna Healthplans* (1999) 21 Cal.4th 1066, 1086 ["[w]hen we construe potentially conflicting statutes, our duty is to harmonize them if reasonably possible"]; *Walters v. Weed* (1988) 45 Cal.3d 1, 9 ["[s]tatutes that are apparently in conflict should, if reasonably possible, be reconciled [citation], even when the court interprets provisions in different codes"]; *Ailanto Properties*, *supra*, 142 Cal.App.4th at p. 591 [refusing to adopt an interpretation of Gov. Code section that "would negate other statutory provisions" in the Water Code]; *In re Marriage of Paddock* (1971) 18 Cal.App.3d 355, 359 ["[s]tatutes should be construed so as to harmonize the various sections, and wherever possible seemingly conflicting provisions should be reconciled to avoid the declaration of an irreconcilable conflict"].)

Our interpretation is also consistent with the goal of encouraging individuals to serve on boards of directors and trustees of corporations and charities. Allowing insurers to provide for defense costs in criminal cases against corporate agents enhances the ability of for-profit and non-profit organizations to attract directors, trustees, and volunteers who otherwise might hesitate or decline to serve because of a fear of lawsuits and criminal prosecutions. (See *In re WorldCom, Inc. Securities Litigation* (S.D.N.Y. 2005) 354 F.Supp.2d 455, 469 ["[u]nless directors can rely on the protections

without actual malice and in the apparent interests of the public entity." (Gov. Code, § 995.8, subd. (b).)

given by D & O policies, good and competent men and women will be reluctant to serve on corporate boards"]; *Homestore, Inc. v. Tafeen* (Del. 2005) 888 A.2d 204, 211 ["[i]ndemnification encourages corporate service by capable individuals by protecting their personal financial resources from depletion by the expenses they incur during an investigation or litigation that results by reason of that service"]; Griffith, *Uncovering a Gatekeeper: Why the SEC Should Mandate Disclosure of Details Concerning Directors' and Officers' Liability Insurance Policies* (2006) 154 U.Pa. L.Rev. 1147, 1171 ["[c]orporate managers insist on D&O insurance to protect their personal wealth from the risk of shareholder litigation, making such coverage necessary to attract qualified persons to board service and executive-level employment"].)

Our interpretation that insurers may pay for defense costs in federal and some state criminal actions is also consistent with the principle that insureds charged with crimes begin with a presumption of innocence. (See *Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 541 [presumption of innocence is "that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law,'" quoting *In re Winship* (1970) 397 U.S. 358, 363 [90 S.Ct. 1068, 25 L.Ed.2d 368]]; *Gong v. Firemen's Ins. Co.* (1962) 202 Cal.App.2d 686, 691 [insured accused of criminal acts enters "upon the trial clothed with the presumption of innocence," "one of the strongest disputable presumptions known to the law"]; see also *U.S. v. Stein* (2d Cir. 2008) 541 F.3d 130, 156 ["the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain"]; *Associated Elec. & Gas Ins. Services v. Rigas* (E.D.Pa. 2004) 382 F.Supp.2d 685, 700 [insureds under D&O policy involved in a criminal prosecution "[u]ntil and unless they are found guilty, they are presumed innocent and must enjoy the constitutionally-based prerogatives of any citizen who stands merely accused, but not convicted, of a crime"]; *CGU Ins. v. Tyson Assoc.* (E.D.Pa. 2001) 140 F.Supp.2d 415, 421 [public policy precluding insurance coverage for willful criminal acts or for intentional torts "is not appropriately considered during the duty to defend analysis," particularly where insureds "have not been found guilty of any

wrongdoing"].) The law punishes individuals convicted of crimes, not those accused of crimes.

Finally, Mt. Hawley points to the statement in the dissenting opinion in *Bodell* that "no California court has ever construed an insurance policy to cover criminal defenses." (*Bodell*, *supra*, 119 F.3d at p. 1421 (dis. opn. of Kozinski, J.).) No California court, however, has ever construed an insurance policy like this one not to cover criminal defenses, nor has any California court ever held that it is against public policy for an insurer to agree to provide a defense to criminal charges. The two cases cited by the dissent in *Bodell*, *Perzik v. St. Paul Fire & Marine Ins. Co.* (1991) 228 Cal.App.3d 1273 (*Perzik*), and *Jaffe*, *supra*, 168 Cal.App.3d 930, involved medical malpractice general liability policies that provided a defense to claims for damages and did not include an express provision providing for a defense against criminal charges. (See *Perzik*, at p. 1275; *Jaffe*, at p. 933.)[17] The policy here, unlike the policies in *Perzik* and *Jaffe*, provides that a covered claim includes "a criminal proceeding against any Insured commenced by the return of an indictment" and that Mt. Hawley has a duty to defend such a claim.[18]

> f. *Breach of the implied covenant of good faith and fair dealing*

The trial court granted Mt. Hawley's motion for summary adjudication on Lopez's second cause of action for breach of the implied covenant of good faith and fair dealing on the ground that section 533.5 precluded a duty to defend. The trial court ruled:

---

[17] Actually, only the policy in *Perzik* contained an express duty to defend provision. The insured in *Jaffe* argued that the duty to defend arose because of the potential for coverage. (See *Jaffe*, *supra*, 169 Cal.App.3d at pp. 933-934.)

[18] Mt. Hawley makes the entirely circular argument that it did not contract to provide Lopez with a defense because the policy states that "Loss shall not include . . . (5) matters (other than punitive or exemplary damages) which are uninsurable under the law pursuant to which the Policy shall be construed," and section 533.5, subdivision (b), precludes any duty to defend. Because we conclude that section 533.5, subdivision (b), does not preclude Mt. Hawley's duty to defend, exclusion (5) from the definition of loss for uninsurable matters does not apply.

"Having found that Mt. Hawley did not breach the insurance contract by refusing to defend against the Indictment because Insurance Code section 533.5 bars coverage for his defense, the Court holds that Dr. Lopez's claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law." The trial court did not reach Mt. Hawley's alternative argument that it was entitled to summary adjudication on Lopez's bad faith claim because "Mt. Hawley's denial was reasonable and based on a genuine dispute" regarding its duty to defend Lopez against the criminal charges and the application of section 533.5, subdivision (b). Mt. Hawley argues on appeal that, even if section 533.5, subdivision (b), does not preclude it from providing Lopez with a defense, it is still entitled to summary adjudication on Lopez's bad faith "because its position has been *at least* reasonable."

It is doubtful that the so-called "genuine dispute doctrine" applies in third party[19] duty to defend[20] cases like this one. Here, assuming the reasonableness of Mt. Hawley's

---

[19] (See *Yan Fang Du v. Allstate Ins. Co.* (9th Cir. 2012) 697 F.3d 753, 758 [collecting cases and concluding that whether the genuine dispute doctrine applies to duty to settle third party claims under California law is "unsettled"]; *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 530 ["it has never been held that an insurer in a third party case may rely on a genuine dispute over coverage to refuse settlement"]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 12:618, p. 12B-104 (rev. #1, 2011) ["[t]he extent to which the 'genuine dispute' doctrine may apply in third party cases is presently unclear"].)

[20] (See *Harbison v. American Motorists Ins. Co.* (E.D.Cal. 2009) 636 F.Supp.2d 1030, 1040 ["[b]ecause the existence of a genuine dispute as to the insurer's liability indicates that there is at a potential for coverage, the existence of a genuine dispute is itself enough to trigger the insurer's duty to defend," and therefore "the genuine dispute doctrine appears wholly incompatible with duty to defend cases"]; *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 951 [noting that the insurer in that case "has failed to cite any cases that apply the genuine dispute doctrine to the duty to defend and our research has not disclosed any" and that the "doctrine has been applied primarily in first-party coverage cases"]; but see *Gaylord v. Nationwide Mut. Ins. Co.* (E.D.Cal. 2011) 776 F.Supp.2d 1101, 1125 ["the Court must respectfully disagree with *Harbison*'s conclusion that the 'genuine dispute doctrine' cannot apply in all bad faith duty to defend cases"]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 12:618.5 to 12:618.10, pp. 12B-105 to 12B-106 (rev. #1, 2012) [suggesting that whether the

43

position is a defense to Lopez's claim that Mt. Hawley refused to provide Lopez with a defense in bad faith, material factual issues precluded Mt. Hawley from prevailing on this claim on summary adjudication.

The reasonableness of an insurer's conduct is ordinarily a question of fact, except in the "exceptional instance when 'only one reasonable inference can be drawn from the evidence.'" (*Lee v. Fidelity Nat. Title Ins. Co.* (2010) 188 Cal.App.4th 583, 599; see *Dalrymple v. United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 511 ["[i]n general, where bad faith is alleged, a jury is empowered to resolve conflicting evidence regarding an insurer's conduct and motives"]; *Walbrook Ins. Co. v. Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1454-1455.) While we agree that Mt. Hawley's legal position on the interpretation of section 533.5, subdivision (b), was reasonable (see *above*), Lopez presented other evidence that created factual issues regarding the reasonableness of Mt. Hawley's conduct in refusing to provide Lopez with a defense to the indictment. For example, at least two years before Mt. Hawley refused to defend Lopez against the criminal investigation and indictment for allegedly covering up the liver transplant diversion under the "Not For Profit Organization and Executive Liability Policy," Mt. Hawley had "promptly" and "[i]mmediately following notification of the claims" agreed to defend DCHS against the same criminal investigation under the same policy.[21] At one point Mt. Hawley had even "advanced some $600,000 under a reservation of

---

existence of a genuine dispute as to coverage precludes bad faith liability for refusing to provide a defense depends on whether the dispute is factual or legal].)

[21] This evidence came from evidentiary admissions in Mt. Hawley's litigation with DCHS. "A pleading in a prior civil proceeding may be offered as an evidentiary admission against the pleader" on summary judgment. (*Magnolia Square Homeowners Assn. v. Safeco Ins. Co.* (1990) 221 Cal.App.3d 1049, 1061; see Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2012) ¶¶ 10:43, p. 10-12 (rev. #1, 2011), 10:150.1, p. 10-59 (rev. #1, 2011).) Such an admission is an evidentiary admission, not a judicial admission, and may be rebutted with explanatory evidence from the party against whom the admission is offered. (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 426; *Magnolia Square*, at p. 1061; *Dolinar v. Pedone* (1944) 63 Cal.App.2d 169, 177.)

rights" to DCHS.[22] Mt. Hawley never explained why it treated St. Vincent's so differently from Lopez and why it denied Lopez the same defense it provided to St. Vincent's for charges arising out of the same events.

Lopez also alleged and presented evidence that Mt. Hawley refused to provide Lopez with a defense based on an exclusion, the medical incident exclusion, that according to Lopez was not part of the policy. (See *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1281-1282 [insurer's continued reliance on endorsement insureds claimed they never received was "indicia of bad faith" and "one for the jury to decide"]; *Logan v. John Hancock Mut. Life Ins. Co.* (1974) 41 Cal.App.3d 988, 992 [insurer may "not rely on uncommunicated exclusions in a policy not yet issued"].) A jury could reasonably infer from this evidence that Mt. Hawley's conduct toward its insured Lopez was unreasonable and without proper cause. Indeed, Mt. Hawley's motion for summary adjudication did not even address Lopez's allegation that Mt. Hawley breached the implied covenant of good faith and fair dealing by "[d]enying coverage based on an exclusion that cannot be found in the Policy." (See Civ. Proc. Code, § 437c, subd. (f)(1); *McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 975 ["there can be no summary adjudication of less than an entire cause of action"]; *Hindin v. Rust* (2004) 118 Cal.App.4th 1247, 1259 [summary judgment must dispose of an entire cause of action].) Mt. Hawley is not entitled to summary adjudication on Lopez's claim for breach of the implied covenant of good faith and fair dealing.

3. *The Trial Court Properly Overruled Lopez's Demurrer*

Mt. Hawley's first amended complaint asserted two causes of action for declaratory relief, one on the issue of Mt. Hawley's duty to defend and the other on Mt. Hawley's duty to indemnify. Both causes of action were based on Mt. Hawley's allegations that it had no coverage obligations because of (1) section 533.5, (2) the medical incident exclusion, and (3) the remuneration/personal profit exclusion. Lopez

---

[22]   Mt. Hawley later sought reimbursement of the "substantial sums" it had paid DCHS and St. Vincent's.

demurred to the first cause of action only. Lopez argues that the trial court erred by overruling his demurrer.

The trial court properly overruled Lopez's demurrer because his argument that the two exclusions do not apply is based on evidence that was outside the pleadings and not subject to judicial notice on demurrer. For example, Lopez's argument that the medical incident exclusion does not apply depends on factual statements contained in his requests for judicial notice of documents in other cases, such as the declaratory relief action between Mt. Hawley and DCHS. (See *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1055 ["court may take judicial notice that pleadings were filed containing certain allegations and arguments [citation], but a court may not take judicial notice of the truth of the facts alleged"]; *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 130, fn. 7 [court "cannot take judicial notice of the truth of hearsay statements in decisions or court files, including pleadings"].) The factual issue of whether the medical incident exclusion is part of the policy can be resolved perhaps on summary judgment and certainly at trial, but the issue cannot be resolved on demurrer. Because Mt. Hawley's allegations stated a viable claim for declaratory relief on at least on a portion of its first cause of action for declaratory relief, the trial court properly overruled the demurrer. (See *Pointe San Diego Residential Community, L.P. v. Procopio, Cory, Hargreaves & Savitch, LLP* (2011) 195 Cal.App.4th 265, 274 [a "demurrer challenges a cause of action and cannot be used to attack a portion of a cause of action"]; *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 542 [demurrer "may be sustained only if the complaint lacks any sufficient allegations to entitle the plaintiff to relief"].)

Finally, Lopez argues for the first time in his reply brief that issue preclusion bars Mt. Hawley's declaratory relief cause of action. We decline to address this issue. (See *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292, fn. 6 ["[a]rguments presented for the first time in an appellant's reply brief are considered waived"]; *Holmes v. Petrovich Development Co.* (2011) 191 Cal.App.4th 1047, 1064, fn. 2 ["argument is forfeited" where "it is raised for the first time in [appellant's] reply brief without a showing of good cause"].)

## DISPOSITION

The June 21, 2011 order granting Mt. Hawley's motion for summary judgment is reversed.  The October 18, 2010 order overruling Lopez's demurrer to Mt. Hawley's first amended complaint is affirmed.  The judgment is reversed.  Lopez's request for judicial notice of the Judgment of Discharge in his federal criminal case is granted.  Lopez is to recover his costs on appeal.

SEGAL, J.*

We concur:


WOODS, Acting P. J.



ZELON, J.

---

*       Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.